**PERKINS COIE LLP**
Nicola C. Menaldo
*pro hac vice*
Washington Bar No. 44459
NMenaldo@perkinscoie.com
1301 Second Avenue, Suite 4200
Seattle, WA 98101
Telephone: 206.359.8000
Facsimile: 206.359.9000

Elliott J. Joh, Bar No. 264927
EJoh@perkinscoie.com
505 Howard Street, Ste 1000
San Francisco, CA 94105-3204
Telephone: 415.344.7000
Facsimile: 415.344.7050

Mikella M. Hurley
*pro hac vice*
New York Bar No. 5468145
MHurley@perkinscoie.com
700 13th Street, NW
Washington, DC 20005-3960
Telephone: 202.654.6200
Facsimile: 202.654.6211

Doris Alvarez-Reyes, Bar No. 340925
DAlvarezReyes@perkinscoie.com
1888 Century Park East, Suite 1700
Los Angeles, CA 90067-1721
Telephone: 310.788.9900
Facsimile: 310.788.3399

*Attorneys for Defendant Reddit, Inc.*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

DOMINIQUE NELSON, individually and on behalf of similarly situated individuals,

Plaintiff,

v.

REDDIT, INC., a Delaware corporation,

Defendant.

Case No. 3:25-cv-01470-JLS-AHG

[Removed from the Superior Court of the State of California for the County of San Diego, Case No. 25CU022609C]

**REDDIT, INC.'S NOTICE OF SUPPLEMENTAL AUTHORITY**

# NOTICE OF SUPPLEMENTAL AUTHORITY

Defendant Reddit, Inc. ("Reddit"), by and through its counsel of record, respectfully submits this Notice of Supplemental Authority.

- On September 24, 2025, the Honorable David S. Cunningham III of the Superior Court of California, County of Los Angeles issued an opinion in *Sean Rose v. Variety Media, LLC*, No. 25STCV01865 (Cal. Super. Sept. 24, 2025) ("*Rose*"), that is relevant to Reddit's Motion to Dismiss Class Action Complaint (ECF No. 15). A true and correct copy of the Court's opinion is attached hereto as Exhibit A.
- On November 21, 2025, *Variety Media, LLC* filed a Petition for Writ of Mandate and/or Prohibition challenging the Honorable David S. Cunningham III's September 24, 2025 ruling in *Rose*. *See Variety Media, LLC v. Superior Court of the State of California*, Court of Appeal No. B350578 (Ct. App. Nov. 21, 2025). A true and correct copy of the Petition for Writ is attached hereto as Exhibit B.
- On January 8, 2026, the Court of Appeal of the State of California, Second Appellate District, Division Three, issued an Order to Show Cause as to why the relief sought in the writ petition should not be granted. *See Variety Media, LLC v. Superior Court of the State of California*, Court of Appeal No. B350578 (Ct. App. Jan. 8, 2026). A true and correct copy of the Court's opinion is attached hereto as Exhibit C.
- On January 20, 2026, the Honorable Edward J. Davila of the Northern District of California issued an opinion in *In Re Apple Data Privacy Litigation*, No. 5:22-cv-07069-EJD (N.D. Cal. Jan. 20, 2026) that is relevant to the arguments raised in Reddit's Motion to Dismiss Class Action Complaint (ECF No. 15). A true and correct copy of the Court's opinion is attached hereto as Exhibit D.

DATED: January 23, 2026

**PERKINS COIE LLP**

By: */s/ Nicola C. Menaldo*
Nicola C. Menaldo
Mikella M. Hurley
Elliott J. Joh
Doris Alvarez-Reyes

Attorneys for Defendant
REDDIT, INC.

# EXHIBIT A

FILED
Superior Court of California
County of Los Angeles

SEP 24 2025

David W. Slayton, Executive Officer/Clerk of Court
By: T. Lewis, Deputy

Rose (25STCV01865)

~~Tentative~~ **Ruling Re: Demurrer**

**Date:** 9/24/25

**Time:** 11:00 am

**Moving Party:** Variety Media, LLC ("Variety" or "Defendant")

**Opposing Party:** Sean Rose ("Plaintiff")

**Department:** 11

**Judge:** David S. Cunningham III

---

## ~~TENTATIVE~~ RULING

Defendant's demurrer is overruled.

The Court grants Plaintiff leave to amend to allege facts establishing delayed discovery.

## BACKGROUND

This is a putative class action. The operative complaint alleges that Variety's website contains third-party tracking software that allows third parties to collect users' IP addresses and other information – e.g., "device type, browser type, . . . and unique and persistent identifiers." (First Amended Complaint ("FAC"), ¶ 4.)[1] Variety and the third parties allegedly "use the data . . . to de-anonymize and identify users and hyper-target[] [them] with advertising." (Ibid.) Plaintiff claims the purported conduct violates Penal Code section 638.51, the California Invasion of Privacy Act ("CIPA").

Here, Variety demurs to Plaintiff's first cause of action for violation of section 638.51.

## LAW

When considering demurrers, courts read the allegations liberally and in context, and "treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law." (Serrano v. Priest (1971) 5 Cal.3d 584, 591.) "A demurrer tests the pleadings alone and not the evidence or other extrinsic matters. Therefore, it lies only where the defects appear on the face of the pleading or are judicially noticed." (Hahn v. Mirda (2007) 147 Cal.App.4th 740, 747.) It is error "to sustain a demurrer without leave to amend if the plaintiff shows there is a reasonable possibility any defect identified by the defendant can be cured by amendment." (Aubry v. Tri-City Hospital Dist. (1992) 2 Cal.4th 962, 967.)

---

[1] "IP" = internet protocol.

**DISCUSSION**

Defendant contends the demurrer should be sustained because (1) Plaintiff's cause of action is time-barred, and (2) section 638.51 does not apply to "internet-based tracking tools[.]" (Demurrer, p. 8.)

The first contention is unavailing. Defendant asserts that the limitations period is one year. Even assuming the assertion is correct, the FAC alleges that Plaintiff visited Defendant's website "as recently as December 2024" (FAC, ¶ 187), approximately a month before Plaintiff filed the case. Also, the FAC states that, during a visit to the website in October 2024, trackers were installed on Plaintiff's browser and collected his data. (See id. at ¶ 188.) These alleged acts, taken as true, occurred within the limitations period, so the complaint is timely.

The alleged fact that some of Plaintiff's visits took place "as long ago as March 2019" does not change the outcome. (Id. at ¶ 187.) This is a demurrer, not a motion to strike. One timely alleged violation is enough to state a timely claim.

However, if Plaintiff wants to prosecute the alleged visits that allegedly occurred more than one year prior to the filing of the complaint, he needs to allege facts showing delayed discovery. The paragraph he cites in the opposition brief – paragraph 167 – does not suffice. The Court grants leave to amend for this purpose.

Turning to the second contention, Defendant insists that the "text, structure, and legislative history" demonstrate that section 638.51 "does not apply to online, non-telephonic communications." (Demurrer, p. 10; see also id. at pp. 11-18.)

Plaintiff disagrees. He argues that the statute defines "pen register" broadly and that federal courts interpreting CIPA have determined that "online trackers or tracking software" are "pen registers" under section 638.51. (Opposition, p. 10; see also id. at pp. 9, 11-14.)

There is no published California appellate opinion that analyzes this issue, but, as Plaintiff points out, many federal decisions hold that section 638.51 covers "online trackers or tracking software[.]" (Opposition, p. 10; see also Shah v. Fandom, Inc. (N.D. Cal. 2024) 754 F.Supp.3d 924, 928-931; Mirmalek v. Los Angeles Times Communications, LLC (N.D. Cal. Dec. 12, 2024, No. 24-cv-01797-CRB) 2024 WL 5102709, at *3-*4; Riganian v. LiveRamp Holdings, Inc. (N.D. Cal. July 18, 2025, No. 25-cv-00824-JST) 2025 WL 2021802, at *11-*12; Gabrielli v. Motorola Mobility LLC (N.D. Cal. July 14, 2025, No. 24-cv-09533-JST) 2025 WL 1939957, at *11-*12; Rodriguez v. Autotrader.com, Inc. (C.D. Cal. 2025) 762 F.Supp.3d 921, 929-930; Lesh v. Cable News Network, Inc. (S.D.N.Y. 2025) 767 F.Supp.3d 33, 40-42; Greenley v. Kochava, Inc. (S.D. Cal. 2023) 684 F.Supp.3d 1024, 1050.)

One of those federal decisions is Moody v. C2 Educational Systems Inc. (C.D. Cal. 2024) 742 F.Supp.3d 1072. The Moody court evaluated the statutory language. Section 638.51 states:

> (a) Except as provided in subdivision (b), a person may not install or use a pen register or a trap and trace device without first obtaining a court order pursuant to Section 638.52 or 638.53.
>
> (b) A provider of electronic or wire communication service may use a pen register or a trap and trace device for any of the following purposes:
>
> (1) To operate, maintain, and test a wire or electronic communication service.
>
> (2) To protect the rights or property of the provider.
>
> (3) To protect users of the service from abuse of service or unlawful use of service.
>
> (4) To record the fact that a wire or electronic communication was initiated or completed to protect the provider, another provider furnishing service toward the completion of the wire communication, or a user of that service, from fraudulent, unlawful, or abusive use of service.
>
> (5) If the consent of the user of that service has been obtained.
>
> (c) A violation of this section is punishable by a fine not exceeding two thousand five hundred dollars ($2,500), or by imprisonment in the county jail not exceeding one year, or by imprisonment pursuant to subdivision (h) of Section 1170, or by both that fine and imprisonment.
>
> (d) A good faith reliance on an order issued pursuant to Section 638.52, or an authorization made pursuant to Section 638.53, is a complete defense to a civil or criminal action brought under this section or under this chapter.

(Cal. Penal Code § 638.51, subds. (a)-(d).) Section 638.50 defines "pen registers" and "trap and trace devices":

> (b) "Pen register" means a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication. "Pen register" does not include a device or process used by a provider or customer of a wire or electronic communication service for billing, or recording as an incident to billing, for communications services provided by such provider, or a device or process used by a provider or customer of a wire communication service for cost accounting or other similar purposes in the ordinary course of its business.
>
> (c) "Trap and trace device" means a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the

source of a wire or electronic communication, but not the contents of a communication.

(Id. at § 638.50, subds (b)-(c).) Significantly, the Moody court noted that the definitions do not limit "pen registers" and "trap and trace devices" to physical telephone devices and do not require them to be connected to telephone lines. (See Moody, supra, 742 F.Supp.3d at 1076.) Indeed, the Moody court found that the "'expansive' language suggests a broad scope" and "indicates courts should focus less on the form of the data collector and more on the result." (Ibid. [quoting Greenley, supra, 684 F.Supp.3d at 1050].)

The Court intends to follow Moody. This Court has found Moody persuasive in other CIPA actions on its docket. For example, in a case called Sorensen v. GT's Living Foods, LLC (24STCV20548), the Court relied on Moody and found section 638.51 applicable to TikTok software. The Court continues to agree with Moody and the other federal decisions that Plaintiff cites because:

* The plain language is broad. The "pen register" and "trap and trace device" definitions plainly extend beyond telephone devices and telephone communications.

* CIPA's structure supports a broad interpretation. If the drafters had wanted "pen registers" and "trap and trace devices" "to be limited to telephone technologies, they knew how to do so – as evidenced by other sections of CIPA where they imposed such limitations." (Gabrielli, supra, 2025 WL 1939957, at *11 [citing Penal Code sections 631(a) and 632.7].)

* "CIPA's preamble states that '[t]he Legislature by this chapter intends to protect the right of privacy of the people of this state.'" (Shah, supra, 754 F.Supp.3d at 930 [quoting Penal Code section 630].)

* "[T]he California Supreme Court has instructed courts to interpret CIPA in the manner that 'fulfills the legislative purpose of [CIPA] by giving greater protection to privacy interests.'" (Ibid. [quoting Matera v. Google, Inc. (N.D. Cal. Aug. 12, 2016, No. 15-cv-04062) 2016 WL 8200619, at *19, which quotes Flanagan v. Flanagan (2002) 27 Cal.4th 766, 775].)

* CIPA's plain language, structure, preamble, and the Supreme Court's instruction trump legislative history and policy considerations.

The Court finds Defendant's cases unpersuasive. Defendant cites Sanchez v. Cars.com Inc. (Cal. Super. Ct. Jan. 27, 2025, No. 24STCV13201) 2025 WL 487194 and Licea v. Hickory Farms, LLC (Cal. Super. Ct. Mar. 13, 2024, No. 23STCV26148) 2024 WL 1698147. The Court believes these cases give inadequate weight to the statutory text and structure. (See, e.g., Riganian, supra, 2025 WL 2021802, at *12 [finding that the Sanchez court "focused its analysis on the legislative history . . . rather than on the expansive, plain language"].)[2]

[2] Additionally, Defendant cites a concurring opinion from a Ninth Circuit judge. The citation is unpersuasive. The motion was a motion for summary judgment. (See Gutierrez v. Converse Inc. (9th Cir. July 9, 2025, No. 24-4797) 2025 WL 1895315, at *1.) The statute at issue was Penal Code section 631(a). (See ibid.) As noted above, unlike sections 638.50 and 638.51, section 631(a) appears to impose a telephone-related limitation.

Defendant further argues that Plaintiff's interpretation makes section 638.51 conflict with the California Consumer Privacy Act ("CCPA"). Defendant claims CCPA is "an entire, separate statutory scheme" that explicitly applies to "various forms of online interactions." (Demurrer, pp. 16, 17; see also id. at p. 18.)

The Court disagrees with Defendant. At least one case holds that "CCPA and CIPA are complementary." (Mirmalek, supra, 2024 WL 5102709, at *5 [finding that "CCPA does not preempt CIPA"].) And, regardless, overlap between and among statues happens on a pretty regular basis. (See, e.g., Stern, Business & Professions Code Section 17200 Practice (The Rutter Group 2025) ¶ 3:56 [advising that Business and Professions Code section 17200, the Unfair Competition Law ("UCL"), permits parties to bring a UCL claim based on violations of other laws, both common laws and statutes].) The Court does not see any problem, at this stage, with the overlap, if any, between CCPA and CIPA.

Consequently, the demurrer is overruled.

SEP 2 4 2025

DAVID S. CUNNINGHAM III

# EXHIBIT B

Court of Appeal, Second Appellate District
Eva McClintock
Electronically RECEIVED on 11/21/2025 at 4:56:46 PM

Court of Appeal, Second Appellate District
Eva McClintock
Electronically FILED on 11/21/2025 by Rebecca Rodriguez, Deputy

CASE #: B350578, Div: 3

# IN THE COURT OF APPEAL
# OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT
## DIVISION ONE

**VARIETY MEDIA, LLC**

*Petitioner,*

*v.*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

*Respondent.*

From the Superior Court for the State of California, County of Los Angeles, Case No. 25STCV01865, Hon. David S. Cunningham III

## PETITION FOR WRIT OF MANDATE AND/OR PROHIBITION OR OTHER APPROPRIATE RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES; [EXHIBITS FILED UNDER SEPARATE COVER]

**DTO LAW**
*William A. Delgado (SBN 222666)
wdelgado@dtolaw.com
915 Wilshire Boulevard, Suite 1950
Los Angeles, California 90017
(213) 335-6999

Richard Jagdishwar Millett (SBN 337902)
rmillett@dtolaw.com
702 Marshall Street, Suite 640
Redwood City, California 94063
(415) 630-4100

Attorneys for Petitioner
VARIETY MEDIA, LLC

**TO BE FILED IN THE COURT OF APPEAL** **APP-008**

**COURT OF APPEAL** SECOND **APPELLATE DISTRICT, DIVISION** ONE

COURT OF APPEAL CASE NUMBER:

ATTORNEY OR PARTY WITHOUT ATTORNEY: STATE BAR NUMBER: 222666
NAME: William A. Delgado
FIRM NAME: DTO LAW
STREET ADDRESS: 915 Wilshire Boulevard, Suite 1950
CITY: Los Angeles STATE: CA ZIP CODE: 90017
TELEPHONE NO.: (213) 335-6999 FAX NO.:
E-MAIL ADDRESS: wdelgado@dtolaw.com
ATTORNEY FOR (*name*): Petitioner VARIETY MEDIA, LLC

SUPERIOR COURT CASE NUMBER: 25STCV01865

APPELLANT/ PETITIONER: VARIETY MEDIA, LLC

RESPONDENT/ REAL PARTY IN INTEREST: SUPERIOR COURT OF THE STATE OF CALIFORNIA

**CERTIFICATE OF INTERESTED ENTITIES OR PERSONS**

(*Check one*): [x] INITIAL CERTIFICATE [ ] SUPPLEMENTAL CERTIFICATE

**Notice: Please read rules 8.208 and 8.488 before completing this form. You may use this form for the initial certificate in an appeal when you file your brief or a prebriefing motion, application, or opposition to such a motion or application in the Court of Appeal, and when you file a petition for an extraordinary writ. You may also use this form as a supplemental certificate when you learn of changed or additional information that must be disclosed.**

1. This form is being submitted on behalf of the following party (*name* ): Petitioner VARIETY MEDIA, LLC

2. a. [ ] There are no interested entities or persons that must be listed in this certificate under rule 8.208.

b. [x] Interested entities or persons required to be listed under rule 8.208 are as follows:

| | Full name of interested entity or person | Nature of interest (*Explain*): |
|---|---|---|
| (1) | Variety Media, LLC | Real Party in Interest; wholly owned subsidiary of PME Holdings, LLC |
| (2) | PME Holdings, LLC | Parent company of Variety Media, LLC |
| (3) | PME TopCo, LLC | Parent company of PME Holdings, LLC |
| (4) | Penske Media Corporation | Majority owner of PME TopCo, LLC |
| (5) | EMH-PME Holdings, LLC | Minority owner of PME TopCo, LLC |

[ ] Continued on attachment 2.

**The undersigned certifies that the above-listed persons or entities (corporations, partnerships, firms, or any other association, but not including government entities or their agencies) have either (1) an ownership interest of 10 percent or more in the party if it is an entity; or (2) a financial or other interest in the outcome of the proceeding that the justices should consider in determining whether to disqualify themselves, as defined in rule 8.208(e)(2).**

Date: 11/21/2025

William A. Delgado
(TYPE OR PRINT NAME)

(SIGNATURE OF APPELLANT OR ATTORNEY)



Form Approved for Optional Use
Judicial Council of California
APP-008 [Rev. January 1, 2017]

**CERTIFICATE OF INTERESTED ENTITIES OR PERSONS**

Cal. Rules of Court, rules 8.208, 8.488
*www.courts.ca.gov*



**For your protection and privacy, please press the Clear This Form button after you have printed the form.**

# TABLE OF CONTENTS

**Page**


INTRODUCTION ........ 11

QUESTION PRESENTED ........ 15

PETITION ........ 16

Statement of Related Cases ........ 16

Authenticity of Exhibits ........ 16

Beneficial Interest of Petitioners; Capacities of Respondent and Real Parties in Interest ........ 16

Jurisdiction and Timeliness of the Petition ........ 17

Factual Background ........ 17

Procedural Background ........ 20

Why Writ Relief Is Necessary and Appropriate ........ 21

PRAYER ........ 28

VERIFICATION ........ 30

MEMORANDUM OF POINTS AND AUTHORITIES ........ 31

STANDARD OF REVIEW ........ 31

LEGAL DISCUSSION ........ 31

I. The Respondent Court Failed to Properly Analyze Section 638.51's Text. ........ 32

A. The Respondent Court's Literalist Approach Led it Astray from the Start ........ 32

B. Section 638.51's Text and Structure Limit it to Telephonic Technology. ........ 34

1. Legal background: Section 638.51's roots in telephonic technology and terminology. ........ 34

2. Section 638.51's text and structure limit it to telephonic technology. ........ 37

3. Section 638.51's lack of reference to online, non-telephonic communications is critical. ........ 42

II. The Respondent Court's Approach Would Produce Absurd Results. .................................................... 47

III. The Respondent Court's Analysis Creates Irreconcilable Conflicts Between CIPA and the CCPA. ...................................................................... 52

IV. Section 638.51's Legislative History Underscores Its Narrow Scope. .................................................................. 55

V. The Federal Cases Supporting the Respondent Court's Interpretation Are Wrong. .................................... 57

CONCLUSION ........................................................................ 60

CERTIFICATE OF COMPLIANCE ............................................ 64

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Almond All. of California v. Fish & Game Comm'n*, 79 Cal. App. 5th 337 (2022) (statement of Cantil-Sakauye, C.J.) .......... 47

*Ankeny v. Lockheed Missiles & Space Co.*, 88 Cal. App. 3d 531 (1979) .......... 31

*Application of U.S. of Am. for an Ord. Authorizing Use of a Cellular Tel. Digital Analyzer*, 885 F. Supp. 197, 200 (C.D. Cal. 1995) ("*Digital Analyzer*"). .......... 36

*In re App. of U.S. for an Ord. Authorizing the Installation & Use of a Pen Reg. & Trap & Trace Device*, 890 F. Supp. 2d 747 (S.D. Tex. 2012) .......... 36

*Apple Inc. v. Superior Ct.*, 292 P.3d 883 (Cal. 2013) .......... 60

*Cal. Dep't of Tax & Fee Admin. v. Superior Ct.*, 48 Cal. App. 5th 922 (2020) .......... 32

*Cal. Priv. Prot. Agency v. Super. Ct.*, 99 Cal. App. 5th 705 (2024) .......... 52, 53

*California River Watch v. City of Vacaville*, 39 F.4th 624 (9th Cir. 2022) .......... 33, 40

*Casillas v. Cypress Insurance Company*, 770 Fed. App'x 329 (9th Cir. 2019) (unpublished) .......... 51

*CPC Pat. Techs. Pty Ltd. v. Apple, Inc.*, 34 F.4th 801 (9th Cir. 2022) .......... 59

*Day v. City of Fontana* 19 P.3d 1196 (Cal. 2001) .......... 34

*DeMille v. Am. Fed'n of Radio Artists*,
187 P.2d 769 (Cal. 1947) ........................................................ 43

*Farst v. AutoZone, Inc.*,
700 F. Supp. 3d 222 (M.D. Pa. 2023) ....................................... 50

*Flanagan v. Flanagan*,
41 P.3d 575 (Cal. 2002) ........................................................... 34

*Gilligan* v. *Experian Data Corp.*,
2025 WL 2556313 (N.D. Cal. July 11, 2015) ........................... 57

*In re Google Inc.*,
2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) .......................... 60

*Greenley v. Kochava, Inc.*,
684 F. Supp. 3d 1024 (S.D. Cal. 2023) ......................... 58, 59, 60

*Gutierrez v. Converse Inc.*,
2025 WL 1895315 (9th Cir. July 9, 2025)
(unpublished) (Bybee, J., concurring)
.......................................................................................... 24, 43

*Hipsher v. L.A. Cnty. Emps. Ret. Assn.*,
58 Cal. App. 5th 671 (2020) ..................................................... 47

*Jones v. Peloton Interactive, Inc.*,
720 F. Supp. 3d 940 (S.D. Cal. 2024) ....................................... 52

*Khamooshi v. Politico LLC*,
786 F. Supp. 3d 1174 (N.D. Cal. 2025) .................................... 49

*Kishnani v. Royal Caribbean Cruises Ltd.*,
2025 WL 1745726 (N.D. Cal. June 24, 2025) .......................... 50

*Larkin v. Workers' Comp. Appeals Bd.*,
358 P.3d 552 (Cal. 2015) .................................................... 34, 55

*Lesh v. Cable News Network, Inc.*,
767 F. Supp. 3d 33 (S.D.N.Y. 2025) ......................................... 60

*In re Marriage of McIntyre Shayan & Shayan*,
106 Cal. App. 5th 76 (2024) ..................................................... 36

*Martinez v. Cot'n Wash, Inc.*,
81 Cal. App. 5th 1026 (2022) .................................................... 41

*Microsoft Corp. v. Franchise Tax Bd.*,
139 P.3d 1169 (Cal. 2006) ......................................................... 56

*Moody v. C2 Educ. Sys. Inc.*,
742 F.Supp.3d 1072 (C.D. Cal. 2024) ....................................... 59

*Mirmalek v. Los Angeles Times Commc'ns*, 2024 WL
5102709, at *5 (N.D. Cal. Dec. 12, 2024) ........................... 51, 54

*People v. Flint*,
75 Cal. App. 5th 607 (2022) ...................................................... 56

*People v. Mobil Oil Corp.*,
143 Cal. App. 3d 261 (1983) ..................................................... 43

*Rodriguez v. Autotrader.com, Inc.*,
762 F. Supp. 3d 921 (C.D. Cal. 2025) ................................ 57, 60

*Sabi v. Sterling*,
183 Cal. App. 4th 916 (2010) .................................................... 36

*Salazar v. Paramount Glob.*,
133 F.4th 642 (6th Cir. 2025) ............................................ 33, 40

*Saleh v. Nike, Inc.*,
562 F. Supp. 3d 503 (C.D. Cal. 2021) ....................................... 49

*Sanchez v. Glasscanopy, Inc.*,
No. 24STCV18596 ..................................................................... 51

*Schonfeldt v. State*,
61 Cal. App. 4th 1462 (1998) .................................................... 30

*Schulz v. Neovi Data Corp.*,
152 Cal. App. 4th 86 (2007) ...................................................... 31

*Shah v. Fandom*,
754 F. Supp. 3d 924(N.D. Cal. 2024) ....................................... 59

*Smith v. LoanMe, Inc.*,
483 P.3d 869 (Cal. 2021) ........................................................... 56

*Smith v. Maryland*,
442 U.S. 735 (1979) ........................................................ 36, 37

*Thomas v. Papa Johns Int'l, Inc*,
2024 WL 2060140 (S.D. Cal. May 8, 2024), *aff'd*,
2025 WL 1704437 (9th Cir. June 18, 2025) ...................... 48, 49

*Turrieta v. Lyft, Inc.*,
552 P.3d 835 (Cal. 2024) ................................................ 33, 37

*United States v. Taketa*,
923 F.2d 665 (9th Cir. 1991) ................................................. 36

*West Virginia v. EPA*,
597 U.S. 697 (2022) ........................................................ 44, 48

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) ........................................................ 44, 48

*Xu v. Reuters News & Media Inc.*,
2025 WL 488501 (S.D.N.Y. Feb. 13, 2025) ............................ 58

*Yates v. United States*,
574 U.S. 528 (2015) ....................................................... *passim*

*In re Zerbe*,
388 P.2d 182 (Cal. 1964) ...................................................... 43

**Statutes**

18 U.S.C. § 3121 .............................................................. 35, 36

18 U.S.C. § 3125 ..................................................................... 36

18 U.S.C. § 3127 ..................................................................... 36

Bus. & Prof. Code § 22584. ..................................................... 45

Bus. & Prof. Code § 22586 ................................................ 45, 46

Cal. Civ. Code § 1798.100 ................................................. 46, 56

Cal. Civ. Code § 1798.120 ...................................................... 56

Cal. Civ. Code § 1798.120(a)(1) ......................................... 46, 54

Cal. Civ. Code § 1798.150 .......... 54

Cal. Civ. Proc. Code § 1859 .......... 54

Cal. Civil Code § 1798.110 .......... 46

Cal. Civil Code § 1798.115 .......... 46

Cal. Penal Code § 637.2 .......... 54

Cal. Stat. 91, Ch. 839 .......... 44

Cal. Stat. 95, Ch. 620 .......... 44

Civ. Code § 1798.100 .......... 47

Civ. Code § 1798.150 .......... 47

Civ. Code § 1798.140 .......... 46, 47

Civil Code § 1798.175 .......... 55

Penal Code § 631 .......... 51

Pen. Code § 632.01 .......... 45, 56

Pen. Code § 637.2 .......... 43, 44

Pen. Code § 638.50 .......... *passim*

Pen. Code § 638.51 .......... *passim*

Pen. Code § 638.52 .......... *passim*

Penal Code § 638.53 .......... 37, 38, 39

Pen. Code. § 638.54(a) .......... 50

**Other Authorities**

11 C.C.R. § 7013 .......... 45

Michael M. Epstein, J.D., Ph.D., *Identical Facts, Opposite Rulings: Choice Hotels, Hickory Farms, and the Advent of Website "Pen Registers"*, 94 Miss. L.J. 321, 329 (2025)........................................................*passim*

Thomson Reuters, *The California Consumer Privacy Act (CCPA)—Legal glossary* (Mar. 4, 2025)............................ 47

TO: THE HONORABLE PRESIDING JUSTICE AND ASSOCIATES JUSTICES OF THE COURT OF APPEAL FOR THE SECOND APPELLATE DISTRICT OF THE STATE OF CALIFORNIA

## INTRODUCTION

> The language of CIPA is a total mess. It was a mess from the get-go, but the mess gets bigger and bigger as the world continues to change and as courts are called upon to apply CIPA's already-obtuse language to new technologies. Indeed, we have reached the point where it's often borderline impossible to determine whether a defendant's online conduct fits within the language of the statute. . . .
>
> The state of affairs with CIPA is untenable. Courts are issuing conflicting rulings, and companies have no way of telling whether their online business activities will subject them to liability. . . . The California Legislature needs to step up.

*Doe v. Eating Recovery Ctr. LLC*, 2025 WL 2971090, at *1 (N.D. Cal. Oct. 17, 2025) (Chhabria, J.).

This Petition arises out of a recent explosion in class-action litigation threatening virtually every business operating a website in the State of California. These lawsuits have weaponized Section 638.51 of the Penal Code—a *criminal* statute directed to the use of *telephonic* surveillance by law enforcement, enacted via a 2015 amendment to the California Invasion of Privacy Act ("CIPA")—to seek tens of millions of dollars in penalties from California businesses engaging in routine *online* consumer interactions and the ancillary identification of website visitors.

Specifically, this is one of hundreds—potentially thousands—of lawsuits or threatened lawsuits arising out of the *necessary* collection of IP addresses, i.e., numerical identifiers that enable a website to know

where to send the data required to load it in a user's browser, and similar routine practices. *See, e.g.*, Request for Judicial Notice ("RJN"), Exh. I at 7 & Exhibit E (chart showing nearly 800 CIPA cases filed between January 2024 and May 2025); *Digital Wiretapping Litigation Map*, Fisher Phillips (last visited November 21, 2025).[1] The targets of these abusive suits have ranged from media companies like Petitioner to the Associated Press to Dave & Busters; even the Sacramento Food Bank has not been spared. *See, e.g.*, Compl. ¶¶ 172-182 (ECF No. 1) *Kent v. Dave & Buster's Ent.*, No. 3:25-cv-08937 (N.D. Cal. Oct. 17, 2025) (RJN, Exh. A); Compl. ¶¶ 130-138 (ECF No. 1), *Fryling v. The Associated Press*, No. 5:25-cv-02012 (C.D. Cal. Aug. 1, 2025) (RJN, Exh. B); Compl. ¶¶ 156-161 (ECF No. 1), *Timothee v. Meta Platforms, Inc.*, No. 3:25-cv-05106 (N.D. Cal. June 17, 2025) (RJN, Exh. C).

The Respondent Court blessed this legal theory when it overruled Petitioner Variety Media, LLC's ("Variety") Demurrer to Plaintiff Sean Rose's First Amended Complaint ("FAC"). If the Respondent Court's interpretation applying Section 638.51 online prevails, that would risk recasting any entity operating a website in this state into a criminal—including (just to name a few) this Court,[2] the Respondent Superior

---

[1] https://www.fisherphillips.com/print/v2/content/38468/digital-wiretapping-litigation-map.pdf.

[2] Judicial Branch of California, *Privacy Statement,* https://courts.ca.gov/privacy-statement (last visited November 21, 2025) (IP address automatically collected).

Court,[3] the California State Assembly,[4] and even the Greater Los Angeles Make-A-Wish Foundation.[5] Indeed, the campaign website of the current California Attorney General uses one of the exact protocols—the "ADNXS Tracker"—that is the basis of Plaintiff's CIPA claim in this very case.[6] The website operated by our state's primary online privacy watchdog, the California Privacy Protection Agency, is hardly exempt from this lineup either.[7] Amazingly, even Plaintiff's counsel, Bursor & Fisher, is currently seeking court approval for a class notice plan that relies on such data collected from website users in order to identify potential class members and target them for advertisements pertaining to the proposed class settlement. *See* Petition ¶ 34, *infra*.

---

[3] Superior Court of California, County of Los Angeles, *Web Site Privacy Statement,* https://www.lacourt.ca.gov/pages/cp/privacy-statement (last visited November 21, 2025).

[4] California State Assembly, *Terms & Privacy,* https://www.assembly.ca.gov/terms-privacy (last visited November 21, 2025).

[5] *See* Make-A-Wish, *Privacy Policy,* https://wish.org/privacy-policy (last visited November 21, 2025) (disclosing various forms of cookies and other online tracking); Make-A-Wish Greater Los Angeles, https://wish.org/la (last visited November 21, 2025).

[6] Rob Bonta for Attorney General, *Privacy Policy,* https://robbonta.com/privacy-policy/ (privacy policy) (last visited November 21, 2025), *and* view-source:https://robbonta.com/privacy-policy/ (source code referring to ADNXS) (last visited November 21, 2025).

[7] See California Privacy Protection Agency, https://cppa.ca.gov/ (last visited November 21, 2025) (providing hyperlink to "Privacy Policy" found at https://www.dca.ca.gov/about_us/privacy_policy.shtml).

Along these lines, many businesses' data analytics practices are readily determinable from privacy policies they have posted online. Presumably, these privacy policies were crafted in an effort to comply with the California Consumer Privacy Act ("CCPA"), a comprehensive law *expressly* directed at online privacy: the CCPA allows such data analytics practices if they are disclosed and users have an opportunity to opt out of them.

Yet, if the Respondent Court's decision were correct here, the efforts of many or all of these businesses to comply with the CCPA's disclosure requirements simultaneously constitute public invitations to be sued by their California website users on a class-wide basis—or even criminally prosecuted—for violations of CIPA. That is because, with limited exceptions, the CIPA provision being misused in this and similar cases only allows communications falling within its scope to be monitored if a court order or the user's prior consent has been obtained (though, as discussed later herein, the latter option may not be available to many website operators under some readings of CIPA).

Can that possibly be what the Legislature intended in drafting these statutes?

That is what this Petition asks the Court to decide. As Judge Chhabria noted, there are many conflicting decisions on whether CIPA applies to online data collection, and the Respondent Court's order overruling Variety's demurrer is just one of them. Because no appellate court has addressed the applicability of CIPA to online data collection, the state and federal courts in California have fractured, leaving an intractable split that makes it impossible for putative defendants to know whether their conduct is or is not permissible. At

present, the test of whether Section 638.51 applies to online data collection depends entirely on "who is the trial court judge?" That is hardly the hallmark of the rule of law. This Court should grant immediate review to address a pressing question that touches upon dozens, if not hundreds, of pending lawsuits.

## QUESTION PRESENTED

Did the Respondent Court err in overruling Petitioner's demurrer to Plaintiff's Amended Complaint on the grounds that Penal Code Section 638.51 —a law passed to regulate the use of telephonic pen registers by law enforcement—applies to routine, ubiquitous software processes implemented by virtually all commercial websites?

## PETITION

By this verified petition, Petitioner VARIETY MEDIA, LLC ("Variety") alleges:

**Statement of Related Cases**

1. Variety is aware of no formally related cases.

2. However, Variety's parent company has recently been sued in the Alameda County Superior Court under the same legal theory at issue in this Petition, by a putative class plaintiff represented by the same counsel as here, and for substantially similar alleged conduct arising out of substantially similar online technology. *See* Compl., *Niu v. Penske Media Corp.*, No. 25SCV146938 (Cal. Super. Ct., filed Oct. 2, 2025).

**Authenticity of Exhibits**

3. Exhibits supporting this Petition are reprinted in one (1) volume and paginated consecutively from pages APPENDIX_001 through APPENDIX_246 (i.e., "A001-246").

4. All these exhibits are true copies of original documents on file with the Respondent Court, including the reporter's transcript of the oral proceedings that preceded the Respondent Court's order overruling Variety's Demurrer to the First Amended Complaint ("Demurrer"). Petitioner incorporates the exhibits by reference as though fully set forth herein.

**Beneficial Interest of Petitioners; Capacities of Respondent and Real Parties in Interest**

5. Variety is the defendant in an action pending in the Respondent Superior Court captioned *Sean Rose v. Variety Media, LLC*, Case No. 25STCV01865 ("Underlying Action").

6. Respondent, the Superior Court of the State of California for the County of Los Angeles, the Honorable David S. Cunningham III presiding ("Respondent Court"), is now, and at all times mentioned has been, a duly constituted court exercising judicial functions in connection with the Underlying Action.

7. The Real Party in Interest in the Underlying Action is Plaintiff Sean Rose, who brings his claims on behalf of a putative California class.

**Jurisdiction and Timeliness of the Petition**

8. This Petition contests an order issued by Respondent Court in the Underlying Action. The Second Appellate District is the District of the Court of Appeal that hears appeals and entertains writ petitions from the Respondent Court.

9. On September 24, 2025, the Respondent Court issued and served the Order overruling Variety's Demurrer. A001-005 ("Order"). This Petition is therefore filed within 60 days of service of the Order, and so within the presumptive deadline for writ petitions. *See Lab. & Workforce Dev. Agency v. Super. Ct.*, 19 Cal. App. 5th 12, 24 (2018).

**Factual Background**

10. This Petition arises out of the Respondent Court's Order overruling Variety's Demurrer to Plaintiff Sean Rose's operative First Amended Complaint, A134-195 ("FAC").

11. Variety owns and operates the well-known Hollywood trade news website www.variety.com ("Website"). The Website employs standard third-party tracking tools that collect basic metadata about site visitors.

12. Among this information is the user's public IP address, which is "a unique identifier for a device" (i.e., a laptop, smartphone, or other computer) that "is expressed as four sets of numbers separated by periods (e.g., 192.168.123.132)." FAC ¶ 30; *see also* Britannica, *IP Address*, (Nov. 15, 2025), https://www.britannica.com/technology/IP-address. **The internet requires the exchange of IP addresses**: Without access to a user's IP address, a website operator cannot identify where to send the data necessary to load the website on the user's browser.

13. Against this background, the FAC alleges Variety's website installed tracking technology operated by two third-party companies on users' browser: Audigent (owned by Experian) and Microsoft (via its ADNXS tracker) ("Tracking Technology"). FAC ¶ 3. Consequently, when a user visited the Variety website, certain nonpersonal information about the visit—namely the user's public IP address and basic "device metadata" such as browser type, operating system, device type, time zone, and similar technical identifiers—is collected. *Id.* ¶¶ 4, 58-59.

14. Out of these two forms of data, the FAC focuses the most on IP addresses, expositing on the perceived privacy risks associated with disclosure of this information. *See, e.g.*, *id.* ¶¶ 32-54. Indeed, the FAC makes clear that, in Plaintiff's view, the collection of IP addresses alone would be sufficient to trigger a Section 638.51 violation. *See, e.g.*, *id.* ¶¶ 40-42 (alleging IP addresses meet relevant statutory elements).

15. However, the FAC also acknowledges that any time a person visits ***any*** website on the internet, their browser sends a request to the website's server, and the server responds with the

necessary information to display the site correctly. *See id.* ¶¶ 27-28. This exchange ***requires*** the user's public IP address so the server knows where to send the data. *See id.* ¶¶ 28, 31, 38.

16. The FAC thus suggests (correctly) this is a normal part of how the internet works. *See, e.g.*, *id.* ¶¶ 27, 32.

17. In addition to collecting IP addresses and device metadata, the Tracking Technology also allegedly assigned a unique ID to the user, which was stored in the browser and used to track the user across different sessions and websites. *E.g.*, *id.* ¶¶ 110-12. Plaintiff further alleges this data was then shared or matched with other third parties to help build user profiles for marketing purposes. *E.g.*, *id.* ¶¶ 1, 7.

18. In this vein, Plaintiff alleges he visited the Variety website "on his laptop browser as long ago as March 2019 and as recently as December 2024 and has done so throughout the entirety of the class period." *Id.* ¶ 187. During those visits, Variety's website allegedly caused the Tracking Technology to be installed on his browser without his knowledge or consent; it allegedly collected his IP address and device metadata; and it then assigned him a persistent identifier (including the "Hadron ID"). *See id.* ¶¶ 188-94. Plaintiff further alleges this information was shared with other third parties and used to build a profile of his online behavior for advertising purposes. *Id.* ¶¶ 192-94.

19. Plaintiff does not allege any actual, economic loss. *Id.* ¶¶ 196-97. Instead, he seeks only statutory damages of $5,000 per violation under Section 638.51. *Id.* ¶ 215.

**Procedural Background**

20. On January 23, 2025, Plaintiff, on behalf of a putative California-based class, filed his original complaint against Variety. A102. That complaint contained a single claim that Variety violated Penal Code Section 638.51—enacted via an amendment CIPA. A131-133.

21. A First Amended Complaint ("FAC") was filed and served on June 27, 2025. A134. The FAC contained additional allegations not present in the original complaint but still only alleged a single cause of action under Section 638.51 directed to the alleged Tracking Technology on Variety's website. *See* A191-193.

22. Variety filed the Demurrer on July 28, 2025, following a meet-and-confer at which Plaintiff declined to amend the FAC or otherwise address Variety's objections to it. A021-046.

23. The Demurrer principally argued that Section 638.51's text, structure, and history, among other considerations, precluded its application to online, non-telephonic data collection such as the Tracking Technology at issue in the FAC. *See generally id.*

24. After full briefing, the Respondent Court issued a Tentative Ruling overruling the Demurrer as to the principal issue presented there and in this Petition: whether Section 638.51 applies to online, non-telephonic data collection. *See* Order (adopting tentative ruling as final); *see also* A011-019.

25. The Respondent Court first acknowledged there was "no published California appellate opinion that analyzes this issue," but then cited decisions by federal district courts concluding Section 638.51 applies to online data collection. Order at 2.

26. Along those lines, the Respondent Court concluded that the language of Section 638.51 is expansive and not limited to telephone technologies. Order at 4. But it discounted the statutory construction framework, extensive legislative history, and policy considerations Variety offered in its briefing. *See id.*

27. Finally, the Respondent Court disagreed with Variety that the online activities at issue here are governed by the Legislature's recent, comprehensive online privacy legislation, the California Consumer Privacy Act ("CCPA"), and not by Section 638.51. *Id.* at 5. Variety's briefing explained that the CCPA is a separate, comprehensive scheme for online privacy and that applying CIPA to online tracking would create a conflict. *See* A031-042. The Respondent Court disagreed. Order at 5

28. At oral argument, Variety presented extensive arguments against the Tentative Ruling, but the Respondent Court did not adopt these arguments. A213-245 (transcript).

29. The Respondent Court therefore issued its final Order adopting in full the reasoning of its Tentative Order on the principal issue of Section 638.51's applicability.

30. Subsequently, Variety filed an answer to the FAC on October 24, 2025. A196-207. The case is currently in discovery, with Plaintiff having recently served an opening round of discovery requests. *See* Request for Judicial Notice ("RJN"), Exh. G.

**Why Writ Relief Is Necessary and Appropriate**

31. This petition arises from a surge of class-action lawsuits threatening nearly every business operating a website in California. In many of these cases, plaintiffs have leveraged Section 638.51—a

criminal statute originally intended to regulate telephonic surveillance by law enforcement—to seek massive penalties from businesses engaged in routine information collection that is ancillary to the standard commercial operation of a website.

32. The Respondent Court's decision to overrule Variety's Demurrer has effectively contributed to this new wave of litigation, exposing ordinary website operators—news organizations, restaurants, non-profits—anything—to overwhelming, potentially criminal liability for standard practices. *See, e.g.*, Compl. ¶¶ 172-182 (ECF No. 1) *Kent v. Dave & Buster's Ent.*, No. 3:25-cv-08937 (N.D. Cal. Oct. 17, 2025) (RJN, Exh. A); Compl. ¶¶ 130-138 (ECF No. 1), *Fryling v. The Associated Press*, No. 5:25-cv-02012 (C.D. Cal. Aug. 1, 2025) (RJN, Exh. B); Compl. ¶¶ 156-161 (ECF No. 1), *Timothee v. Meta Platforms, Inc.*, No. 3:25-cv-05106 (N.D. Cal. June 17, 2025) (RJN, Exh. C). And "standard" is an understatement: These online data collection practices are so ubiquitous that even this Court,[8] the Respondent Superior Court,[9] and the California State Assembly ,[10] to name just a few, engage in them.

33. Indeed, the campaign website for California's current Attorney General uses one of the exact data collection protocols—the

---

[8] Judicial Branch of California, *Privacy Statement,* https://courts.ca.gov/privacy-statement (last visited November 21, 2025)

[9] Superior Court of California, County of Los Angeles, *Web Site Privacy Statement,* https://www.lacourt.ca.gov/pages/cp/privacy-statement (last visited November 21, 2025).

[10] California State Assembly, *Terms & Privacy,* https://www.assembly.ca.gov/terms-privacy (last visited November 21, 2025).

"ADNXS Tracker"—that is the basis of Plaintiff's CIPA claim here.[11] California's primary online privacy watchdog, the California Privacy Protection Agency, also uses similar analytics technology on its website.[12]

34. And, ironically, in a different CIPA case that has been preliminarily resolved on a class-wide basis, Plaintiff's counsel, Bursor & Fisher, is currently seeking court approval for a class notice plan where notice depends on data collected from website users; the notice plan does not address whether users consented to the data collection. *See, e.g.*, Declaration of Cameron R. Azari, Esq., Regarding Notice Plan, filed in *Shah v. Fandom, Inc.*, No. 3:24-cv-01062-FRL (RJN, Exh. F), ¶ 29 ("Digital Notices will be targeted to selected target audiences[.]"); ¶ 34 ("Digital Notices . . . will be displayed in the State of California"); fn. 13 ("'Affinity Targeting allows Epiq to target specific websites, keywords, and/or relevant to content the targeted users may be viewing.").

35. Given the importance of the legal issues and the high stakes for businesses across California, writ relief is warranted.

36. "Even though a trial court's order overruling a demurrer is subject to review on appeal from the final judgment, an appellate court has the option to review such an order prior to final judgment through writ of mandate." *Cohen v. Superior Ct.*, 102 Cal. App. 5th 706, 715 (2024).

---

11 *See* Note 6, *supra*.

12 *See* California Privacy Protection Agency, https://cppa.ca.gov/ (last visited November 21, 2025) (providing hyperlink to "Privacy Policy" found at https://www.dca.ca.gov/about_us/privacy_policy.shtml).

37. "[W]rit review may be appropriate [(1)] where the remedy by appeal would in fact be inadequate, [(2)] where the writ presents [(a)] a significant issue of law ***or*** [(b)] an issue of widespread or public interest, ***or*** [(3)] where resolution of the issue would result in a final disposition as to the petitioner." *Cnty. of Los Angeles v. Superior Ct.*, 107 Cal. App. 5th 160, 176, (2024) ; *accord Cohen*, 102 Cal. App. 5th at 715 (quoting *California Dep't of Tax & Fee Admin. v. Superior Ct.*, 48 Cal. App. 5th 922, 929 (2020)) (referring to factors (1) and (2) disjunctively).

38. All three factors weigh in favor of granting a writ here.

39. Significant Legal Issue. Variety addresses factor (2)—i.e., the presentation of an issue presenting legal or public significance—first because it is the most salient here. Moreover, this Court has often granted writ review based ***solely*** on this factor. *See Los Angeles*, 107 Cal. App. 5th at 177; *See's Candies, Inc. v. Superior Ct. of California for Cnty. of Los Angeles*, 73 Cal. App. 5th 66, 76 (2021); *Tax & Fee Admin.*, 48 Cal. App. 5th at 929.

40. Here, the legal questions at stake are both novel and far-reaching. Section 638.51 was never intended to regulate online tracking technologies; its language and legislative context make clear that its focus is on telephonic surveillance, not routine website operations. *See generally* A021-044; A085-099; Mem. of Law, *infra*. Nonetheless, seizing on dicta in a 2022 unpublished Ninth Circuit decision relating to a ***different*** CIPA provision, a cottage industry based on utilizing Section 638.51 to sue California-based businesses has arisen. *See Gutierrez v. Converse Inc.*, 2025 WL 1895315, at *3 (9th

Cir. July 9, 2025) (Bybee, J., concurring) (discussing *Javier v. Assurance IQ, LLC*, 2022 WL 1744107 (9th Cir. May 31, 2022)).

41. In the absence of appellate guidance, trial courts have intractably split on whether such cases rely on a proper statutory construction, leaving the fate of California businesses exposed to unpredictable and potentially ruinous liability. *See, e.g.*, Appendix A, *infra* (sample of recent decisions showing splits in rulings); *see also Doe,* 2025 WL 2971090, at *1 ("Courts are issuing conflicting rulings, and companies have no way of telling whether their online business activities will subject them to liability."); Michael M. Epstein, J.D., Ph.D., *Identical Facts, Opposite Rulings: Choice Hotels, Hickory Farms, and the Advent of Website "Pen Registers"*, 94 Miss. L.J. 321, 329 (2025) (recognizing California trial court decision declining to extend Section 638.51 to the internet, and endorsing it over contrary decision).

42. The Legislature has recognized the problem, but recent legislation intended to clarify the statute and eliminate liability has stalled and is exceedingly unlikely to take effect anytime soon. *See, e.g.*, Duane Morris, *California SB 690 Stalls in Assembly - CIPA Liability Remains at Least Through 2026* (July 24, 2025);[13] Benjamin M. Ebbini et al., Fisher Phillips, *California's Proposed Website Cookie Legislation Stalled* (July 21, 2025).[14]

---

[13] https://www.duanemorris.com/alerts/california_sb690_stalls_assembly_cipa_liability_remains_least_through_2026_0725.html (last visited November 21, 2025).

[14] https://www.shrm.org/topics-tools/employment-law-compliance/californias-proposed-website-cookie-legislation-stalled (last visited November 21, 2025).

43. This and other Courts of Appeal have granted writ review in similar circumstances presenting a significant legal question. *See, e.g., See's Candies*, 73 Cal. App. 5th at 76 (granting writ where scope of liability for a large number businesses was unsettled, and an appellate decision would impact other pending cases taking up scarce judicial resources); *Tax & Fee Admin.*, 48 Cal. App. 5th at 929 (question presented bore on whether certain kinds of lawsuits arising out of activities most Californians engage in may be filed at all); *Cohen*, 102 Cal. App. 5th at 716 (writ granted where "widespread" litigation under a statute would have "profound[]" public policy implications altering the *status quo*).

44. The significance of the statutory interpretation issue here is also underscored by the "multiplicity of similar lawsuits," indicating that "[j]udicial economy is served by an early appellate resolution of the issue." *California Highway Patrol v. Superior Ct.*, 135 Cal. App. 4th 488, 496 (2006); *see, e.g.*, *infra*, ¶ 96 (noting potentially thousands of similar cases); *see also Leenay v. Superior Ct.,* 81 Cal. App. 5th 553, 573 (2022) ("[t]he proper interpretation of a statute presents a matter of public interest" warranting writ review when "the issues in th[e] case are likely to recur"); *Volkswagen of Am., Inc. v. Superior Ct.*, 139 Cal. App. 4th 1481, 1487 (2006) ("recurring question in [similar] litigation" warrants early appellate review).

45. The importance of the legal question here alone thus warrants writ review.

46. Lack of Adequate Remedy: Moreover, without immediate appellate intervention, Variety and similarly situated businesses

operating in California will be forced to endure costly and burdensome litigation, with no adequate remedy available after final judgment.

47. Variety already faces extremely burdensome class-wide discovery. *See* RJN, Exh. G. If it is forced to litigate this lawsuit to finality simply to secure a final, appealable judgment, it will have to proceed with the class certification process, defend itself at trial, and risk a potential adverse judgment for statutory penalties, despite the non-existence of any actual damages—all because of the misuse of a statute narrowly directed to telephonic communications.

48. Writ review is appropriate to avoid such wasteful pre-appellate proceedings—particularly when the scope of liability is magnified by virtue of the class-action nature of the matter. *See, e.g.*, *Duke v. Superior Ct.*, 18 Cal. App. 5th 490, 499 (2017) (granting writ review on demurrer because doing so "may prevent a needless and expensive trial and reversal"); *Spielholz v. Superior Court*, 86 Cal. App. 4th 1366, 1370 n. 4 (2001) ("at the pleading stage, mandamus is available . . . when extraordinary relief may prevent a needless and expensive trial and reversal").

49. Final Disposition: Finally, a ruling in Variety's favor would not only resolve this case, but also provide much-needed clarity for potentially hundreds (or more) of similar actions pending in various state, federal, and other fora. *See, e.g.*, *Mitchener v. CuriosityStream, Inc.*, 2025 WL 2272413, at *2 & n.1 (N.D. Cal. Aug. 6, 2025) (listing 17 "similar actions" brought by the same plaintiffs' law firm under Section 638.51 and filed in California federal courts over the past year); RJN, Exh. I (chart showing nearly 800 CIPA cases filed between January 2024 and May 2025); Benajamin W. Perry, *Website Tracker Litigation*

*Continues to Pose Compliance Headache: Updates on CIPA and Related Litigation* (Oct. 21, 2025)[15] (referring to "[h]undreds" of recent CIPA cases based on online tracking technology); Usama Kahf, Fisher Phillips, LinkedIn Post [16] (suggesting "hundreds" underestimates the volume of litigation, noting 2,425 California lawsuits with similar premises, and giving a "best estimate" of 15,000 demand letters "if not more" sent in the past three years).

50. For these reasons, writ review is essential to resolve this critical issue and restore certainty to California's business community.

**PRAYER**

WHEREFORE, Variety prays that a writ of mandate issue from this Court commanding the Respondent Court to vacate its order overruling the Demurrer, issue a new and different order sustaining the Demurrer, dismiss the FAC with prejudice, and grant such other relief as may be just.

William A. Delgado

---

15 https://ogletree.com/insights-resources/blog-posts/website-tracker-litigation-continues-to-pose-compliance-headache-updates-on-cipa-and-related-litigation/ (last visited November 21, 2025).

16 https://www.linkedin.com/posts/usamakahf_cipa-privacylitigation-pixellitigation-activity-7388653543890669568-IN-o/ (last visited November 21, 2025).

**VERIFICATION**

I, William A. Delgado, declare:

1. I am an attorney licensed to practice in California. The following facts are personally known to me and, if called upon, I could and would testify competently to these facts under oath.

2. I am one of the attorneys for Petitioner VARIETY MEDIA, LLC.

3. Because of my familiarity with the relevant facts pertaining to the trial court proceedings, I, rather than the petitioners, verify this petition. *See* Cal. Rules of Court, rule 8.486(a)(4); Code Civ. Proc., § 446.

4. I have read the foregoing petition for writ of mandate and/or prohibition or other appropriate relief and know its contents. The facts alleged in the petition are within my own knowledge and I know these facts to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this verification was executed on November 21, 2025.

William A. Delgado

## MEMORANDUM OF POINTS AND AUTHORITIES

## STANDARD OF REVIEW

On writ review, this Court "independently review[s] a trial court's order overruling a demurrer, including its analysis interpreting . . . statutory provisions." *Cal. Dep't of Tax & Fee Admin. v. Superior Ct.*, 48 Cal. App. 5th 922, 929 (2020) (citations omitted).

For purposes of a demurrer, "all facts properly pleaded in the complaint" are assumed to be true. *Schulz v. Neovi Data Corp.*, 152 Cal. App. 4th 86, 89 (2007). However, the Court need not accept as true "contentions, deductions or conclusions of fact or law." *Schonfeldt v. State*, 61 Cal. App. 4th 1462, 1465 (1998). "It is settled law that a pleading must allege facts and not conclusions, and that material facts must be alleged directly and not by way of recital." *Ankeny v. Lockheed Missiles & Space Co.*, 88 Cal. App. 3d 531, 537 (1979). "If there is no liability as a matter of law," dismissal with prejudice is warranted. *Schonfeldt*, 61 Cal. App. 4th at 1465 (citation omitted).

## LEGAL DISCUSSION

At issue before this Court is the Order overruling Variety's Demurrer to the FAC on the grounds that Penal Code Section 638.51—a criminal statute intended to address privacy concerns related to ***telephonic*** surveillance—applies to ***online, non-telephonic*** data collection, specifically in the context of routine, automated software deployed on commercial websites that allows operators of those sites to collect nonpersonal information about the visitors to those websites. That ruling misconstrued Section 638.51 by misapplying relevant principals of statutory construction, placing undue weight on federal

trial court authorities committing similar errors, and ignoring other important considerations.

Reading Section 638.51 holistically, bearing in mind the definitions of key statutory terms at the time it was enacted, and utilizing other canons of construction discussed below, it is plain the Legislature did ***not*** intend the online activity at issue in this case to fall within CIPA's ambit; rather, it intended only to regulate ***telephonic*** pen registers. Moreover, any ambiguity on that point must be resolved in Variety's favor: Section 638.51 is a ***criminal*** statute with onerous, $5,000 civil penalties assessed on a per-class-member basis, per-violation basis. In light of those considerations, and the fact that extending Section 638.51 online would have major economic and policy implications, the Respondent Court's decision can only be justified by a clear statement of intent by the Legislature to regulate online activity. *See* Section III, *infra* (courts require clear statements in such circumstances). There is none, and so a writ of mandate should issue requiring the Respondent Court to sustain Variety's Demurrer.

## I. The Respondent Court Failed to Properly Analyze Section 638.51's Text.

### A. The Respondent Court's Literalist Approach Led it Astray from the Start.

At the threshold, the Respondent Court ignored or gave short shrift to several important principles of statutory interpretation. While purporting to interpret Section 638.51's "plain language," Order at 4, the Respondent Court did not sufficiently consider that doing so requires a close analysis of the relevant statutory structure and

context, not just a literal reading of the relevant text in isolation. *See, e.g.*, *Turrieta v. Lyft, Inc.*, 552 P.3d 835, 846-47 (Cal. 2024).

To elaborate, Section 638.51 provides that "a person may not install or use a pen register . . . without first obtaining a court order" pursuant to one of two other statutory provisions. Pen. Code § 638.51(a). A "pen register" is defined by the statute as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." *Id.* § 638.50(a). A "provider of [an] electronic or wire communication service" is excepted from the court-order requirement, and may install a pen register, in specific enumerated circumstances, including if the prior "consent of the user of that service has been obtained." *Id.* § 638.51(b).

Plaintiff alleges Variety violated these provisions because the Tracking Technology qualifies as an unauthorized pen register. *E.g.*, FAC ¶ 1. The Respondent Court agreed, calling the statutory definition of pen register "expansive" and noting the lack of explicit limitation to telephonic technology. Order at 4 (quoting *Moody v. C2 Educ. Sys. Inc.*, 742 F.Supp.3d 1072, 1076 (C.D. Cal. 2024)).

But the Respondent Court's task here was not to determine whether the ***literal*** scope of "pen register" could be stretched to fit the online world. *See, e.g.*, *California River Watch v. City of Vacaville*, 39 F.4th 624, 630-32 (9th Cir. 2022) (holding statutory term should not be interpreted literally in light of statutory structure and context); *Salazar v. Paramount Glob.*, 133 F.4th 642, 651 (6th Cir. 2025) ("The pure definitional meaning of words in isolation shouldn't be confused

with the plain meaning of the text.”). Instead, its task was to interpret Section 638.51 to effectuate the legislature’s intent in enacting it. *See Day v. City of Fontana* 19 P.3d 1196, 1198-99 (Cal. 2001).

To discern that intent, the Respondent Court was required to “consider the ordinary meaning of the language in question ***as well as*** the text of related provisions, terms used in other parts of the statute, and the structure of the statutory scheme.” *Larkin v. Workers’ Comp. Appeals Bd.*, 358 P.3d 552, 555 (Cal. 2015) (emphasis added). It was also required to consult legislative history as necessary to resolve textual ambiguities and avoid a construction leading to “absurd consequences.” *Day*, 19 P.3d at 1199.

With those principles in mind, it would be unreasonable to extend the statutory text here to cover online activities wholly unrelated to telephonic communications. As explained below, Section 638.51 uses language closely modelled after the federal pen register statute, 18 U.S.C. §§ 3121 *et seq.* And, at the time Section 638.51 was enacted, the federal statute included language that was understood to limit “pen register” to telephonic technology. Section 638.51’s analogous language and structure require a similar interpretation.

## B. Section 638.51’s Text and Structure Limit it to Telephonic Technology.

### *1. Legal background: Section 638.51’s roots in telephonic technology and terminology.*

For important context, CIPA was first “enacted in 1967, replacing prior laws that permitted the recording of telephone conversations with the consent of one party to the conversation.” *Flanagan v. Flanagan*, 41 P.3d 575, 577 (Cal. 2002). Until 2015, however—when Section

638.51 was enacted—CIPA did not address "pen registers" at all. *See* Cal. Assemb. Comm. on Pub. Safety Hearing Rep. on AB 929, at 10 (Apr. 7, 2015) (RJN, Exh. J).

The absence of pen registers from the state statute created a problem because, in the decades prior to Section 638.51's enactment, the federal pen register statute prohibited state law enforcement agencies from using such devices on an emergency basis, prior to securing a court order, ***unless*** acting "pursuant to a [state] statute." 18 U.S.C. § 3125(a); *see also* Cal. S. Comm. on Pub. Safety, AB 929, at 12 (June 16, 2015) (RJN, Exh. L) (noting this created liability risk for state law enforcement). The absence of pen registers from CIPA created a Hobson's choice for state law enforcement: forego the use of a pen register in an emergency or use it and potentially violate federal law.

Section 638.51, and related pen-register provisions implementing it, were passed for the specific purpose of closing this gap. *See, e.g.*, Cal. S. Comm. on Pub. Safety, AB 929, at 12; Cal. Assembly Comm. on Priv. and Consumer Prot., AB 929, at 1-2, 12-13 (Apr. 21, 2015) (RJN, Exh. K).[17] The California statutory language was extremely similar to the analogous federal language. *Compare, e.g.*, Pen. Code §§ 638.50(b) (pen register definition), 638.51(a) (general prohibition against pen register without court order), 638.51(b) (exceptions to liability), *with* 18 U.S.C. §§ 3127(3), 3121(a), 3121(b) (respective corresponding federal provisions).

---

[17] The other motivating factor was to provide guidance to law enforcement officers in light of the California constitution's stricter protections against searches and seizures compared to the federal Fourth Amendment. *See ibid.*

Interpretations of the federal pen register statute are thus highly instructive in construing Section 638.51. *See, e.g.*, *Sabi v. Sterling*, 183 Cal. App. 4th 916, 943 (2010) (referring to interpretations of federal civil rights statute to interpret similar California statute). And, historically, federal courts widely defined a "pen register" under this federal statute as "a mechanical device that records the numbers dialed on a ***telephone*** by monitoring the electrical impulses caused when the dial on the telephone is released. It does not overhear oral communications and does not indicate whether calls are actually completed." *Smith v. Maryland*, 442 U.S. 735, 736 n.1 (1979) (quoting *United States v. New York Tel. Co.*, 434 U.S. 159, 161 n.1 (1977)) (emphasis added); *see also United States v. Taketa*, 923 F.2d 665, 668 n.1 (9th Cir. 1991) (a pen register is a "device that records the numbers dialed from a monitored telephone"); *In re App. of U.S. for an Ord. Authorizing the Installation & Use of a Pen Reg. & Trap & Trace Device*, 890 F. Supp. 2d 747, 750 (S.D. Tex. 2012) (collecting federal cases explaining that pen registers "seek information about a particular telephone").

The Legislature is "presume[d]" to have known this definition of "pen register" when it enacted Section 638.51 in 2015. *E.g.*, *In re Marriage of McIntyre Shayan & Shayan*, 106 Cal. App. 5th 76, 83 (2024) ("[W]here the Legislature uses terms that have a well-settled judicial construction, we may presume it intends that the terms retain the same meaning that the courts have placed upon them.") (quotations omitted). The intentional selection of the phrase "pen register" at a time when the internet was already a fixture of modern society, and the jargon of such technology (e.g., websites, online data, IP addresses,

tracking technology, etc.) was widely known, immediately suggests that the Legislature intended to adopt a limited, narrow purpose for Section 638.51. *See, e.g.*, Michael M. Epstein, J.D., Ph.D., *Identical Facts, Opposite Rulings: Choice Hotels, Hickory Farms, and the Advent of Website "Pen Registers"*, 94 Miss. L.J. 321, 329 (2025) (recognizing California trial court decisions declining to extend CIPA to the internet on such grounds); Assemb. Comm. on Pub. Safety (RJN, Exh, J) at 10-14 (legislative history referring repeatedly to pen registers as telephonic surveillance tools, including by using *Smith v. Maryland*'s definition above, but not referring to the internet).

*2. Section 638.51's text and structure limit it to telephonic technology.*

Section 638.51's text shows the Legislature's choice of terminology was intended to limit the statute's application to telephonic interactions, ***not*** extend it to commonplace, non-telephonic website interactions.

As noted, interpreting that text properly requires placing it within its larger statutory context. *See, e.g.*, *Turrieta*, 552 P.3d at 846 (statute must be construed as a consistent whole). When the Legislature amended CIPA in 2015 to address pen registers, it organized that amendment into different sections; these include the operative provision prohibiting unauthorized use of a pen register (contained in Section 638.51), the definition of a pen register (Section 638.50), and two implementing provisions explaining how to comply with the operative provision's baseline requirement to obtain a court order (Sections 638.52 and 638.53). As explained below, reading these related statutes consistently requires narrowing the statutory

definition of pen register to telephonic functionality, notwithstanding that definition's lack of an explicit reference to telephones. *See* Pen. Code § 638.50(b) (a "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted . . . .").

Specifically, Section 638.51's text states a pen register may not be installed "without first obtaining a court order pursuant to Section 638.52 or Section 638.53." *Id.* § 638.51(a). Section 638.53 covers "emergency situation[s]" involving dangerous criminal investigations, and provides an expedited procedure if "[t]here are grounds upon which an order could be issued under Section 638.52" ***and*** other prerequisites are met. *Id.* § 638.53(a). Consequently, Section 638.52 sets the baseline requirements for complying with Section 638.51's prohibition against unauthorized pen registers.

That is crucial because Section 638.52 *expressly* presumes that pen registers are used to monitor "telephone" communications, *not* online interactions between computers. Pen. Code § 638.52(d) (an *ex parte* order authorizing a pen register "shall specify . . . [t]he identity, if known, of the person to whom is leased or in whose name is listed **the telephone line to which the pen register or trap and trace device is to be attached** . . . [and] [t]he number and, if known, physical location of **the telephone line to which the pen register . . . is to be attached** . . . .") (emphasis added). Section 638.51 then incorporates those requirements by reference in calling for "a court order pursuant to Section 638.52." Pen. Code § 638.51(a). In other words, Section 638.51 effectively says: Normally, a pen register must be

authorized by "a court order that identifies the person associated with the telephone line to which the pen register . . . is to be attached . . . and the number and physical location of that telephone line."

As another court held in construing the federal analogue of this provision: "This limitation on the proscription against pen registers . . . to prohibit only devices that are 'attached' to a telephone line cannot be assumed to be inadvertent." *Application of U.S. of Am. for an Ord. Authorizing Use of a Cellular Tel. Digital Analyzer*, 885 F. Supp. 197, 200 (C.D. Cal. 1995) ("*Digital Analyzer*"). Instead, it indicates a conscious, deliberate choice to limit the definition of "pen register." *See id.* (holding federal pen register statute did not cover digital device in light of substantially similar provision). So, too, with Section 638.51. Had the Legislature meant Section 638.51 to create—and mandate—a path for website providers to obtain a court order to use cookies or similar software (already a dubious premise), its choice to *expressly* require the identification of telephone lines in order to obtain such an order was certainly a bizarre one. Such an interpretation would require torturing the plain text by ignoring or redefining "telephone."

These structural considerations reveal the fallacy of trying to fit software embedded into a wide range of commercial websites into the statutory definition of "pen register," i.e., "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted . . . ." Pen. Code § 638.50(a). The Respondent Court, relying on federal district court decisions adopting similar reasoning, felt that terms like "device or process" and "wire or electronic communication" were "broad" enough

cover this technology, which ultimately relies on snippets of code to collect information arising out of computer-to-computer electronic interactions. *See* Order at 3-4.[18] But courts routinely eschew mechanical, literal statutory constructions of the kind adopted by the Respondent Court here in the face structural considerations like those discussed above requiring a narrower construction.

Take *California River Watch v. City of Vacaville*, in which the Ninth Circuit held that the word "transportation" in a statute creating liability for the transportation of hazardous waste did not include the movement of waste through a potable water system. 39 F.4th 624, 630 (9th Cir. 2022). The court acknowledged the plain meaning of the term could be broadly construed to cover "any party who moves the waste," but nonetheless held its meaning was limited by statutory context and structure. *Id.* at 630. Because the statute used "transportation" in proximity to the term "transporter," which "carries a specific connection to the waste disposal process throughout [the applicable statute]," the Ninth Circuit similarly limited the term "transportation" to refer only to the deliberate removal of waste in connection with the disposal process. *Id.* at 632. As the Ninth Circuit explained, "a word is given more precise content by the neighboring words with which it is associated." *Id.* (quoting *United States v. Williams*, 553 U.S. 285, 294 (2008)); *see also Salazar*, 133 F.4th at 651 ("The pure definitional

[18] This analysis commits a category error: The definition of "pen register" is ***descriptive*** of a particular kind of telephonic surveillance device used by law enforcement many decades ago when the federal pen register statute was enacted. It is not an abstract, ***prescriptive*** definition of a general category of technology the Legislature wanted to regulate.

meaning of words in isolation shouldn't be confused with the plain meaning of the text.").

*Yates v. United States*, 574 U.S. 528 (2015)—a highly influential U.S. Supreme Court decision on statutory interpretation this and other Courts of Appeal have relied on, *see, e.g.*, *Martinez v. Cot'n Wash, Inc.*, 81 Cal. App. 5th 1026, 1046 (2022)—is also instructive. The question there was whether "tangible object" in a statute regulating the destruction of evidence included a fish thrown overboard by the defendant to conceal its illegal acquisition. *See Yates*, 574 U.S. at 532-35 The Court acknowledged a "tangible object" would literally include any physical object, and that definition would presumably include a fish. *Id.* at 537. Nonetheless, considering the statutory context and history, the Court held the statute did not apply for several reasons. Of particular relevance here, it looked to related statutory provisions referring to the destruction of documents, records, and similar kinds of physical, generally non-piscine objects. *Id.* at 529, 539-42. It also looked at the specific actions criminalized by the statute at issue, which included "alter[ing]," making "false entr[ies]" in, or similarly ruining evidence—acts one would not normally associate with a fish. *Id.* at 529, 544-45.

Similarly, even if an online tracker might be considered a "process" recording "electronic communication[s]" in the most literal sense of those terms, Pen Code § 638.50(b), one would not normally expect—as the statute mandates by default for all "pen registers"—to have to identify the owner and physical location of a telephone line to get permission to collect data on a website (much less through an *ex parte* judicial proceeding). *See* Pen. Code § 638.52(d). Put simply, as

in *California River Watch*, *Yates*, and similar cases, CIPA's definition of "pen register" (in Section 638.50) cannot be divorced from the provisions actually implementing CIPA's protections against such devices (Sections 638.51, 638.52, and 638.53), which strongly point to a narrower construction of Section 638.51. The Respondent Court committed precisely that error, warranting reversal.

*3. Section 638.51's lack of reference to online, non-telephonic communications is critical.*

Had the Legislature intended the term "pen register" to apply to the internet, one expects it would have said so much more clearly. But Section 638.51 does not refer anywhere to the internet; to the contrary, the companion, implementing statutes enacted along with Section 638.51 explicitly refer only to telephonic technology. Section I.B.2, *supra*. The lack of any reference to online activity in Section 638.51 is crucial for at least three reasons that the Respondent Court failed to adequately consider.

***First***, the Respondent Court ignored the crucial fact that Section 638.51 "is a ***criminal*** statute. Even though the flood of recent CIPA cases are private civil actions, the interpretations courts adopt while adjudicating those actions could affect the extent to which people or companies are subject to criminal liability." *Doe*, 2025 WL 2971090, at *6 (emphasis added); *see also* Pen. Code §§ 637.2(a) (private right of action), 638.51(c) (providing for criminal fines or imprisonment). Consequently, the "broad" reading typically afforded to consumer protection statutes does not apply. To the contrary, the statute cannot "be given application beyond [its] plain intent" and must instead be construed narrowly to "include only those offenses coming clearly

within the import of [its] language." *DeMille v. Am. Fed'n of Radio Artists*, 187 P.2d 769, 780 (Cal. 1947); *accord In re Zerbe*, 388 P.2d 182, 184 (Cal. 1964). It must not be interpreted "too broadly" and ambiguities in its text should be construed to ***avoid*** potential criminal liability concerns. *Doe*, 2025 WL 2971090, at *6 (collecting cases).

***Second***, the need for a narrow construction of Section 638.51 becomes even clearer when factoring in the remedies it provides. Specifically, in a civil action, the statute imposes staggering penalties of $5,000 ***per violation*** for each class member even if there are no actual damages; the implication of such penalties counsels against an unduly broad construction of Section 638.51.[19] *See* Pen. Code § 637.2(a), (c); *Gutierrez v. Converse Inc.*, 2025 WL 1895315, at *3 (9th Cir. July 9, 2025) (unpublished) (Bybee, J., concurring) (observing CIPA lawsuits can result in "millions of dollars" in "total recovery (and attorneys' fees)" because "CIPA allows plaintiffs to recover $5,000 per violation"). This highly punitive penalty regime further counsels against extending Section 638.51 to situations not plainly within its intended scope. *See Doe*, 2025 WL 2971090, at *6 (citing cases holding statutes imposing substantial penalties should be construed narrowly); *People v. Mobil Oil Corp.*, 143 Cal. App. 3d 261, 276 (1983) (narrowly construing a statute imposing a "substantial civil penalty" of $500 per violation).

---

[19] Separately, the imposition of such staggering penalties raises the possibility an award would violate the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution, the Excessive Fines Clause of the Eighth Amendment, or similar provisions of the California Constitution.

***Finally***, the notion that the Legislature meant to impose the prospect of millions in statutory penalties on website operators by borrowing language from a federal statute directed at telephone surveillance simply cannot be squared with the canon that legislators do not "hide elephants in mouse holes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). In other words, legislators are expected to be unequivocal when passing laws with major policy implications or an expansive regulatory scope. *See, e.g.*, *West Virginia v. EPA*, 597 U.S. 697, 721–24 (2022) ("Extraordinary grants of regulatory authority are rarely accomplished through modest words, vague terms, or subtle devices.") (quotations omitted). Section 638.51 was passed at a time when the internet was already a major societal and economic fixture, especially in California technology hubs like Silicon Valley.[20]

Accordingly, consistent with the no-elephants-in-mouseholes rule, the Legislature has been ***exceedingly clear*** in recent years when regulating online activity. In 2014 and 2016, for example, the Legislature passed the first state laws that prohibited website operators from collecting certain information about school-age children. *See* 2014 Cal. Stat. 91, Ch. 839 (enacted as Bus. & Prof. Code §§ 22584, *et. seq.*); 2016 Cal. Stat. 95, Ch. 620 (enacted as Bus. & Prof. Code §§ 22586, *et. seq.*). Both laws expressly defined various "online" activities

---

20 Just as one illustrative cultural data point, the movie *The Social Network*—which dramatically depicted the rise of Facebook, the well-known social networking platform, from its founding in 2003—was released in 2010, five years before Section 638.51 was enacted. *See, e.g.*, *The Social Network*, IMDb (accessed Nov. 21, 2025), https://www.imdb.com/title/tt1285016/.

falling in their scope, such as "internet website[s]" and "online application[s]." *Ibid.* CIPA itself (but not Section 638.51) has even been amended to explicitly criminalize narrow categories of online disclosures not at issue here. *See* Pen. Code § 632.01 (regulating the unauthorized disclosure and distribution of healthcare-provider communications on "Internet Web sites and social media," including "blogs").

Most strikingly, only a few years after enacting Section 638.51, the Legislature passed the California Consumer Privacy Act of 2018 ("CCPA"), which explicitly and comprehensively addresses online data privacy. *See, e.g.*, Civ. Code § 1798.140(k), (n), (o), (p), (s), (v); Marjorie Richter, Thomson Reuters, *The California Consumer Privacy Act (CCPA)—Legal glossary* (Mar. 4, 2025)[21] (CCPA was the nation's "first . . . comprehensive consumer privacy law").

Indeed, the CCPA establishes one of the nation's most comprehensive opt-out and disclosure regimes by giving consumers (like Plaintiff) the right to direct businesses not to sell or share their personal information at any time. *See, e.g.*, Cal. Civ. Code § 1798.120(a)-(c) (granting opt-out rights, imposing notice requirements, and providing heightened protections for minors); *id.* §§ 1798.110, 1798.115 (detailed disclosure requirements regarding the collection, use, sale, and sharing of personal information to enable informed opt-out decisions); id. § 1798.100(a) (prohibiting non-disclosed collection, retention, or use of data); *see also* 11 C.C.R. § 7013 (implementing regulations governing opt-out mechanisms). *Compare, e.g.*, FAC ¶¶ 1

---

[21] https://legal.thomsonreuters.com/blog/the-california-consumer-privacy-act/

(“this case is about two things,” the second being the alleged sharing and sale of Plaintiff’s data at “online auction[s]”).

The “[p]ersonal information” protected by the CCPA also expressly includes “[i]dentifiers” of the kind at issue in the FAC, “such as . . . [an] ***online*** identifier, ***Internet Protocol [i.e., IP] address***, . . . or other similar identifiers,” as well as “[g]eolocation data” and “***Internet*** or other electronic network activity information, including, but not limited to, browsing history, search history, and information regarding a consumer’s interaction with an ***internet website*** application, or advertisement.” Civ. Code § 1798.140(v)(1)(A), (F), & (G) (emphases added); *see also id.* §§ 1798.100, 1798.150 (protecting such data). *Compare, e.g.*, FAC ¶¶ 1 (“this case is about two simple things: (i) [Variety]’s Website secretly install[ing] third party code that enabled third parties to grab every visitor’s IP address and device data . . . .”).

The Legislature’s track record of using explicit language when addressing online activity underscores the flaws with the Respondent Court’s approach below. It noted “a broad interpretation of CIPA” is appropriate because “[i]f the drafters had wanted ‘pen registers’ . . . to be limited to telephone technologies, they knew how to do so—as evidenced by other sections of CIPA where they imposed such limitations.” Order at 4 (cleaned up). But that statement ignores the historical context which makes clear that “pen registers” was already understood to refer to telephonic technology. Moreover, Section 638.51 ***does*** refer to telephonic technology via its reference to Penal Code Section 638.52’s provisions governing *ex parte* court orders. *See* Section

I.B.2 & I.B.3, *supra* (explaining how this language colors Section 638.51's structure).

Even if this Court were to discount that arguable indirectness (which it should not), there is absolutely no reference to online activity in Section 638.51 to counterbalance it. It would be anomalous to broaden Section 638.51's scope to online activity notwithstanding this imbalance given how clear the Legislature has otherwise been when choosing to regulate the internet. To the extent any further "tiebreaker" is needed, the various aforementioned canons requiring a clear statement of legislative intent prevent Variety and others from facing online liability.

## II. The Respondent Court's Approach Would Produce Absurd Results.

Further, the Respondent Court's interpretation of Section 638.51 would produce absurd, unjust, and unintended results because it ignores how the modern internet works. *See, e.g.*, *Hipsher v. L.A. Cnty. Emps. Ret. Assn.*, 58 Cal. App. 5th 671, 704 (2020) (courts should avoid absurd and unjust interpretations); *see also Almond All. of California v. Fish & Game Comm'n*, 79 Cal. App. 5th 337, 366 (2022) (statement of Cantil-Sakauye, C.J.) (collecting cases, including *Yates*, evincing that a "statute may be construed in a manner that goes beyond the literal meaning of its text to avoid an absurd result the Legislature could not possibly have contemplated"). The use of tools that collect IP addresses and device metadata—often for analytics, functionality, or advertising—is ubiquitous; so much so that even this Court's own website employs similar technology. *See* Petition ¶ 32, *supra*. Extending Section 638.51 beyond its intended scope would render this

conduct a ***criminal*** offense, potentially exposing virtually every California website operator to both criminal liability and staggering financial penalties.

Had the Legislature intended this harsh result, one expects it would have spoken far more clearly. *Cf. Whitman*, 531 U.S. at 468 ("Congress . . . does not . . . hide elephants in mouseholes."); *West Virginia*, 597 U.S. at 721-24 ("Extraordinary grants of regulatory authority are rarely accomplished through modest words, vague terms, or subtle devices.") (quotations omitted).

Of course, the California Legislature ***has*** spoken clearly in privacy statutes actually directed at online activity, including elsewhere in CIPA and in the CCPA. *See* Section II, *supra*; Section IV, *infra*. And, unsurprisingly, the State of California has ***never*** prosecuted any entity under CIPA for online activity since the statute's enactment in 1967. *See* Cal. Assemb. Comm. on Pub. Safety Hearing Rep. on SB 690, at 7 (June 30, 2025) (RJN, Exh. M).

To the contrary, California's Attorney General has indicated that ***the CCPA*** was the first generally applicable law authorizing it to prosecute allegedly improper use of third-party tracking technology such as that at issue here. *See* RJN, Exh. D (complaint in *People v. Sephora United States*, No. CGC-22-601380 (Cal. Super. Ct. Aug. 23, 2022)) ("Sephora utilizes third-party tracking technology without alerting consumers . . . California's landmark privacy law, the CCPA, sought to prevent this."); *see also* RJN, Exh. E (complaint in *People v. Healthline Media, LLC*, No. CGC-25-626794 (Ca. Super Ct. July 1, 2025) at ¶¶ 1-2 (prosecution under CCPA for utilizing "invisible online

trackers, like cookies and pixels, to communicate data about readers to advertisers" because defendant failed to honor opt-out requests).

Along these lines, in virtually every other context, courts have recognized the absurdity of imposing liability for the kinds of data collection alleged in the Complaint absent violation of an unambiguous statutory command applicable to the internet (such as those contained in the CCPA). Federal courts in particular have uniformly held that the collection of IP addresses and device metadata—or even more sensitive information—does not give rise to a cognizable privacy injury, both for purposes of federal Article III standing and for purposes of stating a traditional California invasion of privacy claim. *See, e.g.*, *Kishnani v. Royal Caribbean Cruises Ltd.*, 2025 WL 1745726, at *4 (N.D. Cal. June 24, 2025); *Khamooshi v. Politico LLC,* 786 F. Supp. 3d 1174, 1179 (N.D. Cal. 2025) (collecting cases); *see also Saleh v. Nike, Inc.,* 562 F. Supp. 3d 503, 525 (C.D. Cal. 2021) (no invasion of privacy when defendant used third-party technology to collect data including user's browser type, operating system, mouse clicks, and keystrokes). That is because (1) IP addresses are voluntarily conveyed as a necessary step in accessing any website and (2) IP addresses and device metadata "are information about an address associated with a device, not sensitive personal information." *Khamooshi,* 786 F. Supp. 3d at 1180.

That such non-sensitive information can be combined with other methods to deduce facts such as one's identity, location, or habits (as the FAC alleges) makes no difference because one cannot reasonably expect to use the modern internet without being monitored. *See, e.g.*, *Thomas v. Papa Johns Int'l, Inc*, 2024 WL 2060140, at *2 (S.D. Cal.

May 8, 2024) (collecting cases), *aff'd*, 2025 WL 1704437 (9th Cir. June 18, 2025); *Farst v. AutoZone, Inc.*, 700 F. Supp. 3d 222, 230 (M.D. Pa. 2023) ("Shopping on a public website, like shopping in a public store, is not an activity one can reasonably expect to keep private from the retailer."). At bottom:

> Most of us understand that what we do on the Internet is not completely private. . . . We recognize, if only intuitively, that our data has to be going somewhere. And indeed it does, feeding an entire system of trackers, cookies, and algorithms designed to capture and monetize the information we generate.

*Thomas*, 2024 WL 2060140, at *2 (quoting *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 266 (3d Cir. 2016)).

Plaintiff may argue Variety could have complied with the law by getting a court order or seeking user consent.[22] But, ironically, it is unclear whether the law permits Variety to do so.

***First***, CIPA's pen register provisions only allow a "peace officer" (i.e., the government) to obtain such an order. Pen. Code §§ 638.52(a), 638.53(a); *see also id.* § 638.54(a) (assuming "a government entity" will have obtained such an order).

***Second***, while Section 638.51 allows the installation of a pen register "[i]f the consent of the user . . . has been obtained," that exception only applies when the party installing the device is a "provider of [an] electronic or wire communication service." *Id.* § 638.51(b) & (b)(5). Not all courts agree that run-of-the-mill website

---

[22] Plaintiff alleges Variety did not seek a court order or prior consent, FAC ¶ 136; Petitioner does not concede the truth of that or any other allegation here, but acknowledges such factual allegations must be treated as true at the pleadings stage.

operators such as Petitioner fall into this category, which has previously been applied to telephone companies. *Mirmalek v. Los Angeles Times*, 2024 WL 5102709, at *5 (N.D. Cal. Dec. 12, 2024); RJN, Exh. H at 5 (decision in *Sanchez v. Glasscanopy, Inc.*, No. 24STCV18596) (such a "position would mean every website is a 'provider of electronic or wire communication service,'" and, as here, "plaintiff does not allege the website permits users to communicate with one another"); *cf. Casillas v. Cypress Insurance Company*, 770 Fed. App'x 329, 330-31 (9th Cir. 2019) (unpublished) (substantially similar exemption in federal statute only applies to websites facilitating direct communications between users). It may thus be ***impossible*** for standard website operators to comply with CIPA.

Had the Legislature intended to effectively outlaw data collection in this way, one again expects it would have been clearer. One also wonders why it would have bothered to pass the CCPA at all. After all, why spend years crafting a statute and its implementing regulations (which allow online data collection so long as there is an opportunity to opt out), when—in fact—a different statute outlaws that technology altogether?

All of which goes to say: "The language of CIPA is a total mess. It was a mess from the get-go, but the mess gets bigger and bigger as the world continues to change and as courts are called upon to apply CIPA's already-obtuse language to new technologies." *Doe*, 2025 WL 2971090, at *1. "Courts are issuing conflicting rulings, and companies have no way of telling whether their online business activities will subject them to liability." *Id. Doe* noted these frustrations were "particularly true" in the context of a "wiretapping" claim under Section

631 of the Penal Code (which covers the contents of a communications), *id.*, but they apply with no less force here. Section 638.51 was never intended to operate in the way Plaintiff would like it to.

## III. The Respondent Court's Analysis Creates Irreconcilable Conflicts Between CIPA and the CCPA.

A judicial extension of Section 638.51 to cover web communications would also "conflict with the statutory scheme" the Legislature has enacted. *Jones v. Peloton Interactive, Inc.*, 720 F. Supp. 3d 940, 948 (S.D. Cal. 2024) (noting statutory language should not be expanded beyond its original purpose in such situations). Specifically, the Legislature enacted comprehensive, explicit online privacy legislation—the CCPA—only three years after enacting Section 638.51. *See* Section II, *supra*. The CCPA expressly covers the kinds of online privacy issues and tracking technology addressed in the FAC, *see id.*, but creates a very different regulatory environment than CIPA.

Crucially, the CCPA generally creates an ***opt-out*** privacy regime[23] for the internet—online consumers have the right to be given notice of the categories of data that are collected about them and the opportunity to "opt out" by directing the website provider not to collect

---

[23] The CCPA was inspired by Europe's General Data Protection Regulation ("GDPR"), which is "opt-in." *See, e.g.*, *Cal. Priv. Prot. Agency v. Super. Ct.*, 99 Cal. App. 5th 705, 714 (2024); Dominique-Chantale Alepin, *Social Media, Right to Privacy and the California Consumer Privacy Act*, 29 Competition J. 96, 100 (2019). But the legislature declined to adopt that feature, evincing an intent to chart a different course. *See, e.g.*, RJN, Exh. N (testimony by author of CCPA explaining CCPA's opt-out regime is arguably ***more*** protective of privacy than GDPR, given most people "simply click 'I agree'" when asked to opt in).

share or sell those categories of data. *E.g.*, Cal. Civ. Code § 1798.120(a)(1*); Priv. Prot. Agency*, 99 Cal. App. 5th at 713.

Conversely, Section 638.51 is "opt-in:" Before information can be collected via a pen register, one must obtain either a court order or the consent of the user of a telephone communications service. Pen. Code § 638.51(a), (b)(5). Given this conflict, the CCPA's internet-specific provisions must supersede Section 638.51's references to pen registers. *See* Cal. Civ. Proc. Code § 1859 (specific indications of legislative intent control over more general ones); *Yates*, 574 U.S. at 546 (interpreting statute narrowly where it was targeted at specific forms of fraud, not "general" destruction of evidence).

Additionally, "CIPA allows plaintiffs to recover $5,000 per violation compared to just $750 per violation under the CCPA." *Gutierrez*, 2025 WL 1895315, at *3 (Bybee, J., concurring) (comparing Cal. Penal Code § 637.2 with Cal. Civ. Code § 1798.150*)*. "In a [putative] class action like this one, the difference in total recovery (and attorneys' fees) could be millions of dollars." *Id.* Holding that Section 638.51 applies here would thus amount to a more than sixfold increase in the potential liability for website operators compared to what the legislature intended in the CCPA. Nothing in the text or history of either statute supports such an anomalous result.

The Respondent Court brushed aside these differences, stating vaguely that CIPA and the CCPA are "complementary," and adding that "overlap between and among statues happens on a pretty regular basis." Order at 5.[24] But that is incorrect. Its reading of Section

---

[24] Puzzlingly, for the latter point, the Respondent Court pointed to California's Unfair Competition Law ("UCL"), a law that by design

638.51 would ***displace*** the CCPA's opt-out regime with a sweeping opt-in regime backed by vastly greater criminal penalties for routine web data collection. The Respondent Court never explained why the Legislature, after enacting the CCPA's comprehensive, detailed regime, would have silently left Section 638.51 as a hidden, drastically harsher mechanism for the same conduct. The penalty mismatch alone—$750 under the CCPA versus $5,000 under CIPA—shows that this interpretation would subvert, not complement, the CCPA.

The Respondent Court's reliance on *Mirmalek*, *supra*, to contend that applying CIPA online would be consistent with the CCPA was also misplaced. For example, *Mirmalek* relied on the CCPA's tiebreaker clause, Civil Code § 1798.175, which says the law most protective of privacy controls in the event of a conflict between the CCPA and another statute. 2024 WL 5102709, at *5. But that analysis ignores the first analytic step commanded by the CCPA, which is that "[w]herever possible, law relating to consumers' personal information should be construed to harmonize with the provisions of [the CCPA]." Cal. Civ. Code § 1798.175. And, unlike with Section 638.51, Section 1798.175 of the CCPA unambiguously regulates (among other conduct) "information collected electronically or over the Internet." *Id.* Thus, any supposed "conflict" exists only if § 638.51 is misapplied to internet tracking in the first place. The statutes harmonize ***only*** when read correctly: The CCPA governs online privacy, and Section 638.51 remains a telephony-focused pen-register rule.

---

serves as an all-purpose vehicle to sue for violations of other statutes or laws. That statutory interaction is far afield from the fundamental conflicts presented here.

Along these lines, Plaintiff's opposition to the Demurrer attempted to reconcile an online version of Section 638.51 with the CCPA by averring both statutes require user consent to collect data. A060-061. That is simply wrong. Specifically, Civil Code Section 1798.100(a)&(b) requires businesses, "at or before the point of collection," to inform consumers of the categories of personal information being collected and the purposes of collection. Affirmative consent is not required except in targeted contexts—such as sales of minors' data or participation in financial incentive programs—while for adults the statute allows collection unless and until the consumer opts out. *See* Cal. Civ. Code §§ 1798.100(a), 1798.120. Put simply, CCPA says "inform," not "obtain consent," and its elaborate opt-out provisions make no sense if mere notice already equaled consent. Cal. Civ. Code § 1798.100(a); *see also id.* § 1798.120 (opt-out provisions). Recasting notice as consent rewrites the statute and erases the opt-out model the Legislature deliberately chose instead of the GDPR's opt-in framework.

In short, the CCPA was the Legislature's carefully calibrated solution for online privacy. The Respondent Court's attempt to transform Section 638.51 into an all-purpose internet privacy law collides with that scheme and would create a sweeping criminal prohibition that the Legislature never enacted.

## IV. Section 638.51's Legislative History Underscores Its Narrow Scope.

Section 638.51's legislative history further confirms "pen register" does not extend beyond telephonic communications. *See, e.g.*, *Larkin*, 358 P.3d at 555 (when statute is ambiguous, courts may look to "extrinsic sources, such as legislative history" to "glean[] the

Legislature's intended purpose"); *Microsoft Corp. v. Franchise Tax Bd.*, 139 P.3d 1169, 1174 (Cal. 2006) (relying on "drafting history" to interpret statute); *see also People v. Flint*, 75 Cal. App. 5th 607, 617 (2022) (relying on "legislative history," because "intent prevails over the letter of the law" when the alternative is "absurd consequences that the Legislature did not intend") (citation omitted).

The legislature could easily have written Section 638.51 in 2015 to encompass the exchange of information between online devices—indeed, CIPA itself has been amended many times to address technological developments, including "in 1985, 1990, and 1992 'to take account of privacy issues raised by the increased use of cellular and cordless telephones,'" *Smith v. LoanMe, Inc.*, 483 P.3d 869, 873 (Cal. 2021) (quoting *Flanagan*, 41 P.3d at 580)—but it did not do so. In fact, in 2017—just ***two years*** after enacting Section 638.51—the legislature amended CIPA again to explicitly address disclosure of private information on "Internet Web sites and social media." *Gutierrez*, 2025 WL 1895315, at *3 (Bybee, J., concurring) (quoting Pen. Code § 632.01). But this amendment only related to the "contents of a confidential communication with a health care provider." *Id.* Critically, Section 638.51 was not updated.

Instead, "[t]he legislative intent, as reflected in discussions before various California Assembly and Senate committees, only addressed pen registers in the context of landline and mobile phones. There was no mention of extending protections to internet technologies." Epstein, *Identical Facts,* 94 Miss. L.J. at 329 & n.58 (footnote omitted) (collecting legislative history); *see, e.g.*, Cal. Assemb. Comm. on Priv. and Consumer Prot. Hearing Rep. on AB 929, at 1 (Apr. 17, 2015)

(RJN, Exh. K) ("[This bill] [a]uthorizes state and local law enforcement agencies to seek an emergency order to use pen registers . . . in ***telephone surveillance***" (emphasis added)).

**V. The Federal Cases Supporting the Respondent Court's Interpretation Are Wrong.**

Both Plaintiff's briefing and the Respondent Court's analysis relied heavily on certain non-binding federal district court cases that have construed Section 638.51 to apply to online tracking technology (or that otherwise were perceived to contain useful talking points). This Court is not bound by these decisions (nor was the trial court), and it should not follow them. These decisions are deeply flawed and do not represent a consensus.

To start, the federal cases heavily cited by the Respondent Court represent only one side of a deep split. Many California judges have disagreed with federal decisions misapplying Section 638.51 to the internet when independently construing the statute. *See, e.g.*, *Rodriguez v. Autotrader.com, Inc.*, 762 F. Supp. 3d 921, 929 (C.D. Cal. 2025) (acknowledging contrary decision); Epstein, *Identical Facts,* 94 Miss. L.J. at 329-33 (discussing California rulings disapproving of internet-based CIPA claims); Mem. ISO Mot. to Dismiss, *Gilligan* v. *Experian Data Corp.*, 2025 WL 2556313 (N.D. Cal. July 11, 2015) (collecting cases). And at least one Ninth Circuit judge has indicated skepticism that CIPA applies online. *See Gutierrez*, 2025 WL 1895315, at *3 (Bybee, J., concurring) (discussing drafting history); *see also Doe*, 2025 WL 2971090, at *7 ("As difficult as it is to apply CIPA to the physical world, it's virtually impossible to apply it to the online world.").

Moreover, federal courts skeptical of web-based CIPA claims often do not even reach the statutory interpretation question presented in this Petition, dismissing such claims for a more fundamental reason: The recent tidal wave in CIPA litigation is rooted in IP-address collection, which federal courts generally do not recognize as a sufficiently concrete privacy injury to create federal standing. *See, e.g.*, *Xu v. Reuters News & Media Inc.*, 2025 WL 488501, at *4-5 (S.D.N.Y. Feb. 13, 2025) (collecting cases). The number of federal decisions endorsing the Respondent Court's interpretation of Section 638.51 is therefore unsurprising: One would only see a contrary federal decision if the court simultaneously held routine online data collection was the sort of practice giving rise to a traditional privacy injury, but that a traditional privacy statute regulating pen registers did not provide a judicial redress for that injury.

Most importantly, the cases cited by Plaintiff and the Respondent Court applying Section 638.51 to online communications fail to properly analyze the statute's text, structure, and legislative history. *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024 (S.D. Cal. 2023), was one of the earliest federal cases to address this issue, and a case upon which nearly all subsequent federal decisions place great importance (if not complete reliance), and so it warrants discussion first.

*Greenley* reasoned that Section 638.51 covers more than telephonic devices because "courts should focus less on the form of the data collector and more on the result." *Id.* at 1050. But that results-oriented framing sidesteps the statutory structure, which places the pen register provisions squarely within a chapter aimed at regulating *telephonic* surveillance. *Greenley* also focused on the "expansive"

language of Section 638.50, without addressing its legislative origins in AB 929 or the statute's consistent focus on telephone dialing data. *Id.* Likewise, *Greenley* treated the phrase "device or process" in Section 638.50 as dispositive, but ignored the Legislature's repeated descriptions of pen registers as tools of "telephone surveillance" capturing incoming and outgoing phone numbers. *See id.*

*Greenley*'s errors have infected virtually all subsequent federal decisions supporting the Respondent Court's analysis here. For example, the Respondent Court relied most heavily on *Moody*, *supra*, which repeated *Greenley*'s error in "focus[ing] less on the form of the data collector and more on the result." 742 F. Supp. 3d 1072, 1076 (C.D. Cal. 2024) (quoting *Greenley*). And Plaintiff's FAC cited approvingly to *Shah v. Fandom*, 754 F. Supp. 3d 924(N.D. Cal. 2024), which (like *Greenley*) interpreted the literal definition of "pen register" as broadly encompassing any technology that records routing information, while minimizing the many structural and contextual indications that Section 638.51 is limited to telephonic communications. *Id.* at 929-30.

This type of snowball effect, where an early, flawed district court decision produces a cluster of later decisions reproducing its flaws, is hardly uncommon. Indeed, the Ninth Circuit has cautioned against overreliance on district court decisions that merely follow the herd rather than engage in independent analysis. *See CPC Pat. Techs. Pty Ltd. v. Apple, Inc.*, 34 F.4th 801, 809 n.8 (9th Cir. 2022) (disagreeing with multiple "non-binding district court decisions" that had interpreted a federal statute identically and simply "cit[ed] each other for support"). There are other examples; many federal decisions on

Section 638.51 offer little more than a cursory cite to *Greenley* or its progeny. *See, e.g.*, *Rodriguez*, 762 F. Supp. 3d at 929 (single paragraph relying on other district court decisions); *Lesh v. Cable News Network, Inc.*, 767 F. Supp. 3d 33, 40 (S.D.N.Y. 2025) (same).

On a slightly different note, a final case warranting discussion is *In re Google Inc.*, 2013 WL 5423918 (N.D. Cal. Sept. 26, 2013). This is a non-Section 638.51 case relied upon by Plaintiff and many federal decisions for the proposition that courts can "update" statutes to apply them to new technology when their language is expansive enough to cover it under a literal reading. *See id.* at *1. But that principle does not apply here because the internet was not "new" in 2015, when Section 638.51 was added to CIPA. *See Apple Inc. v. Superior Ct.*, 292 P.3d 883, 887 (Cal. 2013) (courts may "apply a legal text to technologies that ***did not exist when the text was created***" (emphasis added)). And while "the California Supreme Court regularly reads statutes to apply to new technologies," it only does so "where such a reading would not conflict with the statutory scheme." *Google*, 2013 WL 5423918, at *21 (emphasis added). Reading Section 638.51 to apply to commercial websites would conflict irreconcilably with the CCPA, Section IV, *supra*, so the "new technology" principle does not apply.

## CONCLUSION

Courts throughout California are intractably split on whether Section 638.51 can be applied to standard online technology. Unsurprisingly so. A holistic statutory construction reveals it does not, but some courts, including the Respondent Court, have concluded

otherwise. For the foregoing reasons, the Petition should be granted, and a writ of mandate should issue in Variety's favor.

William A. Delgado

Attorney for Petitioner
VARIETY MEDIA, LLC

**APPENDIX A:**
**Sample of Recent Decisions on Demurrers/Motions to Dismiss Section 638.51 Claims in California State and Federal Courts**

| Case Name | Case Number | State or Federal? | Jurisdiction | Section 638.51 Claim Dismissed? |
|---|---|---|---|---|
| Aviles v. LiveRamp | 24STCV19869 | State | Los Angeles Superior Court ("LASC") | Yes |
| Casillas v. Transitions Optical, Inc. | 23STCV30742 | State | LASC | Yes |
| Gabrielli v. Motorola | 24-cv-09533-JST | Federal | N.D. Cal. | No |
| Garon v. Keleops | 25-cv-02124-DMR | Federal | N.D. Cal. | No |
| Greenley v. Kochava | 22-cv-01327-BAS-AHG | Federal | S.D. Cal. (related cases in D. Mass and D. Idaho) | No |
| Khamooshi v. Politico | 24-cv-07836-SK | Federal | N.D. Cal. | Yes (lack of standing) |
| Kishnani v. Royal Caribbean Cruises Ltd. | 5:25-cv-01473-NW | Federal | N.D. Cal. | Yes (lack of standing, but alternatively on the merits) |
| Licea v. Hickory Farms | 23STCV26148 | State | LASC | Yes |
| Mirmalek v. LA Times | 24CV01797 | Federal | N.D. Cal. | No |
| Mitchener v. CuriosityStream, Inc. | 25-cv-01471-NW | Federal | N.D. Cal | Yes (lack of standing, but alternatively on the merits) |

| Case Name | Case Number | State or Federal? | Jurisdiction | Section 638.51 Claim Dismissed? |
|---|---|---|---|---|
| Moody v. C2 | 2:24-cv-04249-RGK-SK | Federal | C.D. Cal. | No |
| Palacios v. Fandom, Inc. | 24STCV11264 | State | LASC | Yes |
| Rignanian v. Live Ramp | 25-cv-00824-JST | Federal | N.D. Cal. | No |
| Rodriguez v. Autotrader.com | 2:24-cv-08735-RGK-JC | Federal | C.D. Cal. | Initially no, but later yes (lack of standing) |
| Rodriguez v. Fountain9, Inc. | 24STCV04504 | State | LASC | Yes |
| Rodriguez v. Plivo Inc. | 24STCV08972 | State | LASC | Yes |
| Sanchez v. Cars.com | 24STCV13201 | State | LASC | Yes |
| Shah v. Fandom | 24-cv-01062-RFL | Federal | N.D. Cal. | No |
| Sorensen v. Purple Innovation | 24STCV12775 | State | LASC | No |

## CERTIFICATE OF COMPLIANCE

Pursuant to California Rules of Court, rule 8.204(c), I certify that the total word count of this Petition for Writ of Mandate and/or Prohibition or Other Appropriate Relief; Memorandum of Points and Authorities; Supporting Exhibits (Filed Under Separate Cover), excluding covers, table of contents, table of authorities, and certificate of compliance, is 13996.

William A. Delgado

PROOF OF SERVICE

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 915 Wilshire Boulevard, Suite 1950, Los Angeles, CA 90017.

On November 21, 2025, I served true copies of the following document(s) described as PETITION FOR WRIT OF MANDATE AND/OR PROHIBITION OR OTHER APPROPRIATE RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES on the interested parties in this action as follows:

SEE ATTACHED SERVICE LIST

BY FEDEX: I enclosed said document(s) in an envelope or package provided by FedEx and addressed to the persons at the addresses listed in the Service List. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of or delivered such document(s) to a courier or driver authorized by FedEx to receive documents.

BY E-MAIL OR ELECTRONIC TRANSMISSION: I caused a copy of the document(s) to be sent from e-mail address rmendoza@dtolaw.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on November 21, 2025, at Los Angeles, California.

Renata Mendoza

Renata Mendoza

**SERVICE LIST**

| | |
|---|---|
| Timothy Fisher (Bar No. 272392)<br>Kaili C. Lynn (Bar No. 334933)<br>Joshua R. Wilner (Bar No. 353949)<br>**BURSOR & FISHER, P.A.**<br>1990 North California Blvd.,<br>9th Floor<br>Walnut Creek, CA 94596<br>Tel: (626) 300-4455<br>Email: ltfisher@bursor.com<br>Email: klynn@bursor.com<br>Email: jwilner@bursor.com<br><br>Yitzchak Kopel<br>Philip L. Fraietta<br>**BURSOR & FISHER, P.A.**<br>1330 Avenue of the Americas,<br>32nd Floor<br>New York, NY 10019<br>Tel: (646) 837-7150<br>Email: ykopel@bursor.com<br>Email: pfraietta@bursor.com | Attorneys for Real Party in Interest<br>SEAN ROSE<br><br>***(Via E-mail – petition only)***<br>***(Via Fed Ex – Petition and Exhibits)*** |
| Hon. David S. Cunningham III<br>Los Angeles Superior Court<br>Spring Street Courthouse<br>312 North Spring Street<br>Los Angeles, CA 90012<br>Tel: (213) 310-7011 | Case No. 25STCV01865<br><br>***(Via Fed Ex – Petition only)*** |

# EXHIBIT C

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

COURT OF APPEAL – SECOND DIST.
FILED
Jan 08, 2026
EVA McCLINTOCK, Clerk
W. Lopez Deputy Clerk

| | |
|---|---|
| VARIETY MEDIA, LLC<br><br>Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF LOS ANGELES COUNTY,<br><br>Respondent;<br><br>SEAN ROSE,<br><br>Real Party in Interest. | B350578<br><br>(Super. Ct. No. 25STCV01865)<br><br>(David S. Cunningham III, Judge)<br><br>ORDER TO SHOW CAUSE |

TO THE SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE COUNTY OF LOS ANGELES:

We have read and considered the petition for writ of mandate filed November 21, 2025 and the request for judicial notice filed concurrently therewith, as well as the letter briefs filed December 23, 2025, and December 30, 2025.

The request for judicial notice is granted.

Good cause appearing, you are hereby ordered to show cause before this court, in its courtroom at 300 South Spring Street, Los Angeles, California, at a date and time to be determined, why the relief sought in the petition should not be granted. (Cal. Rules of Court, rule 8.528(d).)

Real party in interest may serve and file a return to the petition on or before February 9, 2026. (Cal. Rules of Court, rule 8.487(b).)

Petitioner may serve and file a reply within 15 days following the service and filing of the return.

Pending further order of this court, all proceedings in Los Angeles Superior Court Case No. 25STCV01865 are hereby stayed.

Edmon Egerton [signature]

EDMON, P. J. EGERTON, J. ADAMS, J.

# EXHIBIT D

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

IN RE APPLE DATA PRIVACY LITIGATION

Case No. 5:22-cv-07069-EJD

**ORDER GRANTING MOTION TO DISMISS**

Re: ECF No. 150

Plaintiffs[1] bring this putative class action against Defendant Apple, Inc. ("Apple") for allegedly improper collection and use of Apple mobile device users' data. Plaintiffs allege that Apple collects this data when users interact with Apple's proprietary, first-party applications ("apps")—*e.g.*, the App Store, Apple Music, Apple TV, Books, and Stocks—on their mobile Apple devices. First Am. Compl. ¶¶ 1–6, ECF No. 148 ("FAC"). Further, Plaintiffs claim that Apple misled users into believing that certain settings would restrict Apple's collection, storage, and use of private data, when in reality, the settings did no such thing.

Currently before the Court is Apple's motion to dismiss the FAC under Rules 9(b) and 12(b)(6). The motion is fully briefed, and the Court heard oral argument on October 9, 2025. Opp., ECF No. 152; Reply, ECF No. 153; ECF No. 158. After careful consideration of the parties' briefing and arguments, the Court **GRANTS** Apple's motion.

## I. BACKGROUND

The Court previously summarized the facts of this case in its Order dismissing Plaintiffs'

[1] Bruce Puleo, Carlina Green, David Sgro, A.H. (a minor), Dottie Nikolich, Elena Nacarino, Francis Barrott, Katie Alvarez, E.M. (a minor), and Quincy Venter.



United States District Court
Northern District of California

United States District Court
Northern District of California

first consolidated complaint. MTD Order at 1–3, ECF No. 138. The core facts have not changed and do not bear repeating.

There are, however, a few notable differences between Plaintiffs' original consolidated complaint and the FAC that are relevant to the instant motion. First, the number of named plaintiffs has decreased from fifteen in the original complaint to ten in the FAC. *Compare* ECF No. 115 at 2, *with* FAC at 2. Second, Plaintiffs proceed only with claims based on the "Share [Device] Analytics" setting and abandon their reliance on the "Allow Apps to Request to Track" setting. Finally, Plaintiffs reassert claims the Court dismissed in the MTD Order and assert a new claim under Cal. Penal Code § 638.51, the pen register provision of the California Invasion of Privacy Act ("CIPA").

## II. LEGAL STANDARD

To survive Apple's motion, the FAC "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the facts alleged allow the Court to draw the reasonable inference that the defendant is liable for the alleged misconduct beyond a mere possibility. *Id.* The Court does not, however, accept conclusory allegations or draw unreasonable inferences from the allegations. *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citation omitted). Claims that sound in fraud must satisfy the heightened pleading standard of Rule 9(b), meaning that they must be specific enough to give the defendant notice of the particular misconduct and allege the "who, what, when, where, and how" of the alleged misconduct. Fed. R. Civ. P. 9(b); *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124–25 (9th Cir. 2009).

## III. REQUEST FOR JUDICIAL NOTICE

Before turning to the merits of Apple's motion, the Court addresses Apple's supplemental request for judicial notice in support of its motion. RJN, ECF No. 151. When deciding a Rule 12(b)(6) motion, the Court may consider documents outside of the complaint that are incorporated by reference or subject to judicial notice. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988,

998 (9th Cir. 2018). Under the incorporation by reference doctrine, courts may incorporate documents or portions thereof that are not expressly referenced in the complaint if they form the basis of the plaintiff's claims, or the claims depend on documents' contents. *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005). Courts may also take judicial notice of certain facts that are "not subject to reasonable dispute" because they are "generally known" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

Here, Apple requests that the Court treat as incorporated by reference or take judicial notice of four documents in addition to the seventeen documents the Court considered when deciding Apple's previous motion to dismiss. *See* MTD Order at 6–9. The four documents Apple asks the Court to consider now are copies of (1) the welcome screen that appears when opening the Game Center service; (2) the Game Center settings screen; (3) the Game Center & Privacy disclosure dated January 27, 2025; and (4) the Game Center Developer webpage. RJN, Exs. 19-22, ECF Nos. 151-2–151-5. Plaintiffs did not file an opposition to Apple's RJN.

The Court finds that Exhibits 19 through 22 are properly subject to incorporation by reference or judicial notice for the same reasons the Court articulated in the MTD Order. Exhibits 19 and 20 are not cited in the FAC but are still incorporated by reference because they form the basis of Plaintiffs' claims and "relate to whether Apple disclosed its collection practices and whether Plaintiffs consented to these collection practices." MTD Order at 8. Exhibits 21 and 22 are Apple's publicly-available online privacy policies and terms, of which courts regularly take judicial notice. *See, e.g.*, *id.*; *Opperman v. Path, Inc.*, 205 F. Supp. 3d 1064, 1068 n.3 (N.D. Cal. 2016). Accordingly, the Court will consider Exhibits 19 through 22 in addition to the Exhibits the Court recognized in the prior MTD Order.

**IV. DISCUSSION**

Apple seeks dismissal of several claims asserted in the FAC: violation of CIPA § 632 (eavesdropping or recording confidential communication), violation of CIPA § 638.51 (use of a pen register), violation of Pennsylvania's Wiretapping and Electronic Surveillance Act



United States District Court
Northern District of California

United States District Court
Northern District of California

("WESCA"), invasion of privacy under the California Constitution, and violation of California's Unfair Competition Law ("UCL"), breach of implied contract, and unjust enrichment. Apple also requests that the Court dismiss allegations in the FAC regarding Apple's Game Center. The Court addresses each issue in turn, beginning with Plaintiffs' new claim under CIPA's pen register provision.

**A. CIPA § 638.51**

Section 638.51 of CIPA prohibits the "install[ation] or use [of] a pen register or a trap and trace device without first obtaining a court order pursuant to Section 638.52 or 638.53." Cal. Penal Code § 638.51. The statute defines the term "pen register" to mean "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." *Id.* § 638.50(b). Apple contends that Plaintiffs do not and cannot invoke the pen register statute for several reasons.

**1. Identification of a Pen Register**

First, Apple argues that Plaintiffs fail to identify a pen register. Section 638.51 defines "pen register" as capturing information "transmitted by an *instrument* or *facility*." Cal. Penal Code § 638.50(b) (emphases added). As such, Apple contends that the pen register must be something separate from the instrument or facility that transmits the communications. Applied here, this interpretation renders implausible Plaintiffs' allegation that Apple's apps are pen registers, because the apps are themselves the source of the communications. Plaintiffs do not necessarily dispute Apple's reading of the statute but argue that Apple misconstrues the FAC, because it is the "processes within Apple's Apps, not the applications as a whole, that operate as pen registers." Opp. at 15.

Plaintiffs' theory runs into several problems. First and foremost, the theory Plaintiffs lay out in their opposition brief is not what they allege in the FAC. Plaintiffs specifically allege that "*Apple's mobile applications* constitute a 'pen register' because they are devices or processes that record addressing or signaling information . . . from the electronic communications transmitted by

their devices." FAC ¶ 186 (emphasis added). Plaintiffs' allegations clearly identify Apple's apps as the recording devices or processes, not some undefined processes within those apps, and Plaintiffs may not amend the FAC through their brief. *Apple Inc. v. Allan & Assocs. Ltd.*, 445 F. Supp. 3d 42, 59 (N.D. Cal. 2020). Perplexingly, Plaintiffs seemed to change their theory once again at the hearing on Apple's motion to dismiss. When asked whether Plaintiffs believe Apple's apps or some process within the apps are the alleged pen register, Plaintiffs stated that "it's both . . . [because] the application is inherently a collection of processes." 10/9/2025 Hearing Tr. at 28:6-11, ECF No. 160. This more closely aligns with the FAC's allegations but still leaves Plaintiffs' theory of liability unclear at best.

Even if Plaintiffs had pled their process theory in the FAC, it would still fail to state a claim. The Court agrees with Apple that the statute's definition of "pen register" necessarily applies only to a device or process separate from the source of the transmitted communications. To interpret the statute otherwise would lead to absurd results. For example, if read the other way, the pen register statute would create criminal liability for call logs on cell phones because the logs list routing information like the phone numbers called from a particular phone. Plaintiffs' argument that the alleged pen register is the processes running Apple's apps as opposed to the apps themselves is a distinction without difference, because it does not change the fact that both are a part of the same "instrument or facility" that is the source of the communication.

Still, Plaintiffs argue that other courts have interpreted the term "pen register" broadly to include "processes that record users' IP addressing information, but not the content of the electronic communications being transmitted from users' computers or smartphones," a definition that easily encompasses the app processes here. Opp. at 15–16 (citing *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 928 (N.D. Cal. 2024); *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023)). Plaintiffs contend that *Greenley* and *Shah* stand for the rule that "courts should focus less on the form of the data collector and more on the result." *Shah*, 754 F. Supp. 3d at 928 (quoting *Greenley*, 685 F. Supp. 3d at 1050). The Court agrees with this proposition as a general matter, but *Greenley* and *Shah* are inapposite. In those cases, the alleged pen registers were third-

party trackers that were embedded in websites and intercepted communications between the user and the website, so it was clear that the pen register was separate from the source of the communication. *Greenley*, 685 F. Supp. 3d at 1032; *Shah*, 754 F. Supp. 3d at 928. Not so here. Apple's first-party apps and their underlying processes are a part of the source of the transmitted communications, which is enough to disqualify them from being pen registers. Accordingly, failure to identify a pen register under the statute's definition is one ground for dismissing Plaintiffs' Section 638.51 claim.

**2. Application to Internet Communications**

Apple next argues that Section 638.51 only regulates collection of telephone information and should not be extended to internet data. Apple notes that the statute explicitly references use of a pen register for collecting information from telephones, so it cannot apply to other technologies as a matter of statutory interpretation.

The California Supreme Court instructs that when interpreting statutory provisions, "each sentence must be read not in isolation but in the light of the statutory scheme," so "[a]n interpretation that renders related provisions nugatory must be avoided." *Lakin v. Watkins Associated Indus.*, 6 Cal. 4th 644, 659 (1993). Here, Apple contends that applying the pen register statute to internet communications runs afoul of this principle. Apple observes that another provision in the statute requires any court order authorizing use of a pen register to "specify . . . [t]he number and, if known, physical location of the *telephone line* to which the pen register . . . is to be attached." Cal Penal Code § 638.52(d)(3) (emphasis added). Extending Section 638.51 to internet communications would render this provision "nugatory." Indeed, recent decisions from California state courts have agreed. *See, e.g.*, *Sanchez v. Cars.com Inc.*, 2025 WL 487194, at *3 (Cal. Super. Jan. 27, 2025) (rejecting extension of CIPA's pen register provision to internet communications based on the statutes' "plain language and legislative intent"); *Casillas v. Transitions Optical, Inc.*, 2024 WL 4873370, at *2 (Cal. Super. Sept. 9, 2024) ("Section 638.50 does not address the privacy rights of Internet users.").

However, many federal district courts, including those in this District, have interpreted the



United States District Court
Northern District of California

Case 5:22-cv-07069-EJD Document 161 Filed 01/13/26 Page 7 of 21

pen register statute in the manner proposed by Plaintiffs. These courts rejected the argument that CIPA's pen register definition applies only to telephone technology, citing "the expansive language in the California's Legislature's chosen definition [of pen register]," which is "specific as to the type of data the pen register collects . . . but [] vague and inclusive as to the form of the collection tool." *Greenley*, 684 F. Supp. 3d at 1050; *see also Shah*, 754 F. Supp. 3d at 928 (citing *Greenley*); *Mirmalek v. Los Angeles Times Commc'ns LLC*, No. 24-CV-01797, 2024 WL 5102709, at *3 (N.D. Cal. Dec. 12, 2024) (same).

Considering this apparent split in authority regarding the proper interpretation of Section 638.51, the question of whether the pen register statute applies outside of the telephone context is a close call. Both readings apply sound statutory interpretation principles but reach different results. Without the benefit of further developments in caselaw on this issue, the Court is at this time inclined to follow what is currently the majority rule in federal district courts. Accordingly, the pen register statute applies to internet communications and does not bar Plaintiffs' claim here.

**3. Application to Private Entities**

Apple's next related argument is that the pen register provision only applies to law enforcement and not private entities. Section 638.51 prohibits the installation or use of a pen register, unless "a person . . . obtain[s] a court order obtained pursuant to Section 638.52 or 638.53." Cal. Penal Code § 638.51(a). Section 638.52 and 638.53, in turn, provide guidelines for "peace officers" or law enforcement officers seeking such an order. *Id.* §§ 638.52, 638.53. Apple argues that CIPA's pen register provision therefore only applies to law enforcement officers.

The Court disagrees. Though the requirements for court orders in Sections 638.52 and 638.52 apply only to law enforcement officers, Section 638.51 is not so narrow. The plain language of Section 638.51 suggests that it applies to the broader category of "persons" as opposed to only "peace officers." *People v. Adir Int'l, LLC*, 114 Cal. App. 5th 275 (2025) ("When the Legislature uses different words as part of the same statutory scheme, those words are presumed to have different meanings." (quoting *Romano v. Mercury Ins. Co.*, 128 Cal. App. 4th 1333, 1343 (2005)). Read together, the statute prohibits any person's installation or use of a pen



United States District Court
Northern District of California

register but carves out a narrow exception for peace officers who receive authorization to do so via court order. *Shah*, 754 F. Supp. 3d at 930 (holding that § 638.52 "does not alter the definition of a pen register. Instead, that section lists the procedures that law enforcement officers must follow when applying for a pen register.") This interpretation still comports with the legislative purpose of Section 638.51: "to create a comprehensive framework governing how California law enforcement officials could obtain and use a pen register or trap and trace device, just like its federal counterpart." *Sanchez*, 2025 WL 487194, at *3.

### 4. Contradictory Causes of Action

Lastly, Apple argues that Plaintiffs' Section 638.51 claim fails because it contradicts their Section 632 claim. The definition of "pen register" for Section 638.51 covers devices or processes that record "dialing, routing, addressing, or signaling information" and explicitly excludes those that record "the contents of a communication." Cal. Penal Code § 638.50(b). Meanwhile, Section 632 prohibits eavesdropping on or recording the substance of "confidential communication[s]," which excludes "non-content-based conduct coincident to the communication." *People v. Drennan*, 84 Cal. App. 4th 1349, 1356 (2000). Collection of the same communications thus cannot simultaneously violate both provisions.

Yet, Apple contends that Plaintiffs allege just that in the FAC. Plaintiffs' Section 632 claim asserts that Apple's apps recorded their "communications," and Plaintiffs' Section 638.51 claim asserts that the same apps recorded only the "dialing, routing, addressing, or signaling information." *Compare* FAC ¶¶ 162–63, *with id.* ¶ 186. Plaintiffs' first response to this is that there is no contradiction because certain processes within the app act as the pen register while others record the content of the communications. But as explained above, Plaintiffs did not plead this new process theory in the FAC, and they may not amend their complaint through briefing. Stuck with their allegation that it is Apple's apps, not the processes therein, that record user data, Plaintiffs admit that the apps "collect a variety of information – some of which are 'communications' and some which are 'routing, addressing, or signaling information.'" Opp. at 19.



United States District Court
Northern District of California

Plaintiffs attempt to still salvage these contradictory claims by arguing that Plaintiffs are permitted to plead their pen register claim in the alternative under Federal Rule of Civil Procedure 8(d)(3). While that may be true, Plaintiffs have not done so in the FAC. Plaintiffs did not indicate that they plead their pen register claim as an alternative to their Section 632 claim. In fact, in their pen register claim, Plaintiffs expressly "incorporate[d] by reference and re-allege[d] each and every allegation set forth in paragraphs 1 through 105" (FAC ¶ 182), including their allegation that Apple's apps captured "confidential communications" (*id.* ¶¶ 11–20). These inconsistent allegations and causes of action are another ground for dismissal of Plaintiffs' pen register claim. *U.S. Med. Instruments, Inc. v. CFS N. Am., Inc.*, 2013 WL 6055387, at *9 (S.D. Cal. Nov. 13, 2013) ("The Ninth Circuit has held that where inconsistent allegations are not pled in the alternative, but are expressly incorporated into each cause of action, an allegation may constitute a judicial admission by the plaintiff which allows dismissal of the complaint.") (citing *Maloney v. Scottsdale Ins. Co.*, 256 F. App'x 29, 31 (9th Cir. 2007)).

* * *

In sum, Plaintiffs fail state a claim for violation of CIPA's pen register provision. The Court therefore GRANTS Apple's motion to dismiss this claim. Given the deficiencies identified in this Order, the Court doubts that Plaintiffs can plead a viable claim under the pen register statute. But since this is the first time Plaintiffs have asserted this claim, the Court grants leave to amend.

**B. CIPA § 632**

In the FAC, Plaintiffs reassert their claim for violation of CIPA section 632. Section 632 prohibits "intentionally and without the consent of all parties to a confidential communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication." Cal. Penal Code § 632(a). Apple contends that Plaintiffs' claim fails once again, because Plaintiffs do not plead that the data Apple allegedly collected was "confidential" or a "communication" or that Apple engaged in eavesdropping or recording.

United States District Court
Northern District of California

### 1. Confidential

Section 632 defines "confidential communication" to exclude circumstances in which the parties "may reasonably expect that the communication may be . . . recorded." Cal. Penal Code § 632(c). As such, California courts presume that internet communications do not give rise to a reasonable expectation of privacy, in part because they are written communications that are by their very nature recorded. *Revitch v. New Moosejaw, LLC*, No. 18-CV-06827, 2019 WL 5485330, at *3 (N.D. Cal. Oct. 23, 2019) (collecting cases); *Boulton v. Community.com, Inc.*, No. 23-3145, 2025 WL 314813, at *2 (9th Cir. Jan. 28, 2025) (holding that text messages that are "by nature recorded" cannot be "confidential" communications under Section 632).

Apple contends that this presumption applies here. As internet-connected applications, Apple's apps operate using the client-server model, in which client devices—here, Plaintiffs' mobile devices—request services from Apple's servers that then record the request and transmit the requested information back to the client devices. These device-to-server transmissions are "by their very nature recorded on the [device] of at least the recipient" and thus are not "confidential" communications under Section 632. *See In re Google Inc. Gmail Litig.*, 2013 WL 5423918, at *23 (N.D. Cal. Sept. 26, 2013) (emails not "confidential" under Section 632).

Plaintiffs do not dispute that Apple's apps operate in this manner. They instead assert that their withdrawal of consent by turning off the "Share [Device] Analytics" setting created a reasonable expectation that none of their usage data[2] would be sent to Apple.

The Court disagrees. Consumers may hold a subjective expectation that no usage data would be sent to Apple, but that expectation is objectively unreasonable. As the Court stated in in its previous Order, "[n]o reasonable consumer would expect to engage in a transaction with Apple without *some* data being collected from Apple to process that transaction." MTD Order at 29–30. The same continues to apply with equal force here. Plaintiffs allege Apple collects myriad data points that fall under the definition of "usage data," but almost all of this data is of the kind one

[2] Plaintiffs rely on Apple's definition of "usage data," which includes browsing history, search history, product interaction, crash data, performance and other diagnostic data, and other usage data. FAC ¶ 41.

Case 5:22-cv-07069-EJD Document 161 Filed 01/20/26 Page 16 of 21

would expect Apple would need to collect in order to respond to Plaintiffs' requests. *See* FAC ¶¶ 55–59.

Plaintiffs specifically focus on Apple's collection of referral URLs and search terms, but neither change the result. For Apple to respond appropriately to a user's request, it must record the requested referral URL or search terms on its servers, and Plaintiffs fail to explain how such data collection is unnecessary. The cases Plaintiffs rely upon are distinguishable from the instant one, because they dealt with third-party tools used for intercepting an alleged communication between a user and the intended recipient. *See In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 799 (N.D. Cal. 2022); *Smith v. YETI Coolers, LLC*, 754 F. Supp. 3d 933, 939, 943 (N.D. Cal. 2024); *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 596 (9th Cir. 2020). Plaintiffs' reliance on turning off the "Share [Device] Analytics" setting does not justify a departure from the presumption that first-party internet communications are not confidential. As such, Plaintiffs have not sufficiently alleged that any communication Apple collected was "confidential."

**2. Communication**

Though CIPA itself does not define "communication," the California Court of Appeal has interpreted the term to mean "a singular conversation or exchange shared between two or more participants." *Gruber v. Yelp Inc.*, 55 Cal. App. 5th 591, 607 (2020), *as modified on denial of reh'g* (Oct. 23, 2020). The exact contours of this definition are still somewhat undefined, but it is clear that "communication" refers to the substance or content of an exchange of ideas, not the "non-content-based conduct coincident to the communication." *People v. Drennan*, 84 Cal. App. 4th 1349, 1358 (2000). This interpretation is consistent with the legislative purpose behind the statute: to prevent "intrusion on one's thoughts, ideas, or knowledge." *Id.; Cf. In re Zynga Priv. Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014) (holding that "contents" of an online communication for purposes of the federal Wiretap Act "refers to the intended message conveyed by the communication, and does not include record information regarding the characteristics of the message that is generated in the course of the communication")

The Court previously dismissed Plaintiffs' Section 632 claim because their allegations



United States District Court
Northern District of California

lacked detail from which the Court could conclude that the information Apple collected was "communication." MTD Order at 26. The Court held that much of the information Apple allegedly collected—the kind of mobile device used, the device's screen resolution, the device's keyboard language, what users tapped on, which apps users searched for, and how long an app was viewed—fell into the bucket of "non-content-based conduct coincident to the communication" as opposed to part of the "communication" itself. *Id.* at 26–27; *see Drennan*, 84 Cal. App. 4th at 1358.

Plaintiffs contend that the FAC now contains enough specificity to satisfy the "communication" element of their Section 632 claim. Specifically, Plaintiffs argue that "URLs of referral websites that open [Apple's] Apps, including URLs from healthcare providers and financial institutions . . . [as well as] users' gender, user agent, IP latitude, IP longitude, IP city, referral app name, destination URL, search terms, and user actions" fit the bill. Opp. at 13–14 (citing FAC ¶¶ 12, 54–60).[3]

As an initial matter, user agent, IP latitude, IP longitude, IP city, and user actions are the same kinds of data the Court already found not to be "communication" in the MTD Order, because they pertain to *how*, not *what* information is relayed. MTD Order at 26–27 (explaining that "what users 'tapped on'" and "how the user was connected to the internet" fell outside the scope of "communication"). Plaintiffs' continued reliance on *Brown v. Google LLC* is misplaced. 685 F. Supp. 3d 909 (N.D. Cal. 2023). There, too, the court held that "users' IP addresses and their user-agents, [are] the record, not substance, of the communication." *Id.* at 935.

Search terms and URLs, on the other hand, may constitute "communication" if the data convey the user's inner thoughts and ideas. *Cf. In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 795 (N.D. Cal. 2022) (finding that URLs such as "hartfordhospital.org/services/digestivehealth/conditions-we-treat/colorectal-small-bowel-

[3] Plaintiffs also contend that the "communications" in their allegations pertain only to transmitted data that is unnecessary for any Apple app to function. Opp. at 8. The Court addresses this issue in the context of whether Plaintiffs alleged the collected data was "confidential." *See supra* Section III.B.1.



United States District Court
Northern District of California

disorders/ulcerative-colitis" are "content" under Wiretap Act because they disclose the "substance of the communication"); *Brown*, 685 F. Supp. 3d at 935 (same for URL that revealed "that the user was searching for updates on Russia's war against Ukraine"). However, Plaintiffs have not shown that that is the case here. Plaintiffs mostly allege that they searched for apps and stock symbols by name, but simply searching for app titles on the App Store or stock symbols does not necessarily convey thoughts and ideas. That information is more akin to browsing apps and stocks than exchanging a user's substantive information. *Cf. Vita v. New England Baptist Hosp.*, 243 N.E.3d 1185, 1199 (Mass. 2024) ("Browsing and accessing the information published on a website is significantly different from having a conversation or sending a message to another person."). And though Plaintiffs allege that Apple collected the URLs of referral and destination websites, Plaintiffs have not pled the specific text of those URL, so the Court is unable to infer that they contained users' thoughts and ideas. These deficiencies doom most of Plaintiffs' allegations of "communication."

There is, however, one exception. Plaintiff Carlina Green alleges that she used search terms such as "roommate," "LSAT," "screen time," and "used cars." FAC ¶ 12. These search terms go beyond browsing specific apps on the App Store to reveal her inner thoughts and interests. Accordingly, the Court finds that only Plaintiff Green has alleged that Apple collected her "communication" under Section 632.

### 3. Eavesdropping or Recording

Section 632 also requires "eavesdrop[ping] upon or record[ing]" confidential communication. Cal. Penal Code § 632(a). Plaintiffs do not contend that Apple "eavesdrops" but maintain that Apple records their confidential communications. Apple does not dispute that its servers record user data but argues that Section 632 applies only to a person who "uses" a recording device and not to a company like Apple receiving data transmissions that are by nature recorded on servers. Reply at 8 (citing *Boulton*, 2025 WL 314813 at *2). The sole authority Apple cites for this proposition, however, does not state that a company like Apple cannot "record" communications under Section 632. *Boulton* only stands for the rule that data



United States District Court
Northern District of California

transmissions that are by nature recorded cannot be "confidential communications." Accordingly, Plaintiffs have sufficiently pled that Apple recorded their communication for purposes of Section 632.

* * *

In sum, Plaintiffs have not adequately pled a claim under CIPA Section 632. Their allegations do not overcome the presumption that the data Apple collects is "confidential." Nor have Plaintiffs sufficiently pled that the collected data constitute a "communication," with the exception of the search terms that Plaintiff Green used in the App Store. The Court therefore GRANTS dismissal of Plaintiffs' Section 632 claim.

**C. WESCA**

WESCA prohibits the intentional interception of the contents of any electronic communication using a device (18 Pa. C.S. §§ 5702–03) and "operates in conjunction with and as a supplement to the Federal Wiretap Act." *Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121, 125–26 (3d Cir. 2022). Apple argues that Plaintiffs again fail to state a WESCA claim because (1) Plaintiffs have not pled that Apple collected the "contents" of any communication; (2) Plaintiffs fail to allege collection by a "device"; and (3) Apple was the direct recipient of any communication.

**1. Contents**

Under WESCA, "contents" means "any information concerning the substance, purport, or meaning of that communication." 18 Pa. C.S. § 5702. This definition is identical to the Federal Wiretap Act's definition of "contents," and identical terms in the two statutes are "interpreted in the same way." *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 113 n.6 (3d Cir. 2003). As noted above (*supra* Section III.B.2), the "contents" of an online communication under the Wiretap Act are "the intended message conveyed by the communication, [which] does not include record information regarding the characteristics of the message that is generated in the course of the communication." *In re Zynga*, 750 F.3d at 1106.

The Court previously dismissed Plaintiffs' WESCA claim because their allegations

United States District Court
Northern District of California

"lack[ed] sufficient detail to infer that the information collected amounted to more than just 'record' data." MTD Order at 28. In the FAC, the sole Pennsylvania plaintiff, David Sgro, alleges that he searched for Zoom, Brave Browser, Instagram, and pdf scanner in the App Store and accessed other apps in the App Store through third-party websites. *Id.* ¶ 13. For the same reasons discussed above (*see supra* Section III.B.2), search terms do not constitute "contents" when the terms are simply the titles of particular apps on the App Store. And without any allegations about the specific text of referral URLs from third-party websites, the Court cannot discern how such data would convey the "substance, purport, or meaning" of any communication." 18 Pa. C.S. § 5702. Thus, Plaintiffs do not adequately allege the collection of "contents."

**2. Device**

A "device" under WESCA means "[a]ny device or apparatus . . . that can be used to intercept a wire, electronic or oral communication." 18 Pa. C.S. § 5702. Plaintiffs allege that their mobile devices are the intercepting devices (FAC ¶ 202),[4] but Apple argues that cannot be, since the device performing the interception must be separate from the source of the communication. The Court agrees. Though WESCA does not explicitly state so, it would make little sense for the device that transmits the communication to also be the intercepting device. *See Commonwealth v. Diego*, 119 A.3d 370, 374 (Pa. Super. Ct. 2015) (rejecting argument that the device that was "the origin of the intercepted message" could be the same as "the device that purportedly intercepted that message"). Plaintiffs thus fail to allege an intercepting "device" under WESCA.

**3. Direct-Party Exception**

Apple also argues that Plaintiffs' WESCA claim cannot proceed because Apple was the direct recipient of communication, and where "a party receives information from a communication

[4] Puzzlingly, Plaintiffs once again contradict their allegations in the FAC by arguing that "Apple's Apps (and the processes therein) are the intercepting devices." Opp. at 20–21. The FAC clearly alleges that "Apple's mobile devices (e.g., iPhones, iPads, and Apple Watches)" are the relevant devices. FAC ¶ 202. The Court will disregard Plaintiffs' argument that Apple's apps or any processes are "devices" for purposes of WESCA as another improper attempt to amend the FAC through briefing. *See Apple Inc. v. Allan & Assocs. Ltd.*, 445 F. Supp. 3d 42, 59 (N.D. Cal. 2020).



United States District Court
Northern District of California

United States District Court
Northern District of California

as a result of being a direct party to the communication, there is no interception." *Commonwealth v. Proetto*, 771 A.2d 823, 831 (Pa. Super. 2001), *aff'd*, 837 A.2d 1163 (Pa. 2003); *see also Commonwealth v. Cruttenden*, 58 A.3d 95, 98–100 (Pa. 2012). Apple urges the Court not to follow the Third Circuit's decision in *Popa v. Harriet Carter Gifts, Inc.*, a case Plaintiffs cite in their opposition, because that holding was a non-binding "prediction." 52 F.4th 121 (3d Cir. 2022).

In *Popa*, the Third Circuit interpreted a 2012 amendment to WESCA as abrogating the direct-party exception outside of narrow circumstances involving law enforcement. *See id.* at 128 (holding that "the Pennsylvania legislature decided to codify a specific, narrow intended-recipient exemption for law enforcement, limiting *Proetto* and *Cruttenden* to their facts"). The circuit court reasoned that a broader direct-party exception would run contrary to another part of the statute that allows interception only where all parties to the communication consent. *Id.* This holding was not mere prediction; the Third Circuit was persuaded that Pennsylvania Supreme Court would agree with the circuit court's interpretation. *Id.* at 129. Likewise, this Court sees no reason to divert from the Third Circuit's sound interpretation of the amended WESCA. The Court therefore rejects the argument that the direct-party exception applies here to immunize Apple from WESCA liability.

For the foregoing reasons, the Court GRANTS Apple's motion to dismiss Plaintiffs' WESCA claim.

**D. California Constitution Invasion of Privacy**

To state a claim for invasion of privacy under the California Constitution, Plaintiffs must plausibly allege that (1) they possess a legally protected privacy interest, (2) they maintain a reasonable expectation of privacy, and (3) Apple's intrusion is "so serious . . . as to constitute an egregious breach of the social norms" such that it is "highly offensive." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 601 (9th Cir. 2020). Though Apple contends that Plaintiffs have not pled any of the three elements, courts often focus on the second and third elements when testing the sufficiency of a California invasion of privacy claim. *Id.*

United States District Court
Northern District of California

Here, the Court need only reach the second element of whether Plaintiffs have a reasonable expectation of privacy. When dismissing Plaintiffs' invasion of privacy claim last time, the Court found that "[n]o reasonable consumer would expect to engage in a transaction with Apple without *some* data being collected from Apple to process that transaction," but stopped short of deciding exactly *which* data consumers should reasonably expect to be collected by Apple. MTD Order at 29–30. Plaintiffs contend they have now amended their allegations to address this issue. Plaintiffs argue reasonable consumers would not expect Apple to collect data that is "unnecessary" for the functionality of Apple's apps—the user's gender, birth year, IP latitude, IP longitude, and URL—especially given that Plaintiffs withdrew consent to Apple's collection of usage data by turning off the "Share [Device] Analytics" setting. Opp. at 22–23.

Plaintiffs' allegations still miss the mark. In determining whether a plaintiff has a reasonable expectation of privacy, courts consider the sensitivity of the data and the context in which the data was allegedly collected. *See In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 603 (holding that whether plaintiffs have a reasonable expectation of privacy in collected data depends on "whether the data itself is sensitive *and* whether the manner it was collected . . . violates social norms"); *see also Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1077 (N.D. Cal. 2021) (considering "the amount of data collected, the sensitivity of the data collected, and the nature of the data collection"). The Court already found it plausible that turning off the "Share [Data] Analytics" setting would create a reasonable expectation that Apple would not collect some user data. But Plaintiffs' current argument that this reasonable expectation of privacy covers data that is "unnecessary" to the functioning of Apple's apps is unconvincing for a couple of reasons. First, Plaintiffs do not clearly differentiate in their allegations what data are "necessary," and which are "unnecessary," nor do they substantiate the premise that Apple's apps do not require the "unnecessary" data elements to function. IP latitude and IP longitude, for example, are required by certain apps that provide location-specific services. And date of birth is likewise necessary for apps providing age-restricted services.

Second, even if they had made a clear distinction, Plaintiffs have not demonstrated that the

data they deem "unnecessary" is highly sensitive. Plaintiffs raise URLs as an example of highly sensitive data that Apple collects and claim that the Court has already found URLs to be data in which consumers would have a reasonable expectation of privacy. Plaintiff's reliance on the MTD Order is misplaced. As the Court stated previously, URLs can be constitutionally problematic if they reveal information about a user's internet activity. *See United States v. Forrester*, 512 F.3d 500, 510 n.6 (9th Cir. 2008). But more general URLs that do not reveal more personal information, such as www.apple.com, do not raise the same issues. Plaintiffs have not pled enough in the FAC for the Court to plausibly infer that data Apple allegedly collected contained the type of detailed personal information that courts have found to be highly sensitive.

Indeed, the data collection Plaintiffs complain of here is different in kind and degree to the data collection courts have found to support a reasonable expectation of privacy. In *Facebook Internet Tracking*, a case that Plaintiffs liken to their own, Facebook allegedly acquired "highly personalized profiles from sensitive browsing histories and habits." 956 F.3d at 604. In *Brown*, another case Plaintiffs rely upon, Google allegedly collected internet activity while in private browsing mode that "may reveal: a user's dating history, a user's sexual interests and/or orientation, a user's political or religious views, a user's travel plans, a user's private plans for the future." 525 F. Supp. 3d at 1077–78. Plaintiffs do not allege that Apple collected any such data. Moreover, as the Court pointed out in the MTD Order, Plaintiffs' allegations concern data Apple allegedly collected from Plaintiffs' interactions with *Apple's own apps*. MTD Order at 30. It is difficult to see how consumers would have a reasonable expectation of privacy in this context.

Accordingly, the Court GRANTS dismissal of Plaintiffs' constitutional invasion of privacy claim.

**E. California UCL**

Apple next challenges the sufficiency of Plaintiffs' renewed UCL claim. Apple argues that Plaintiffs' FAC fails to remedy the three deficiencies which led the Court to dismiss the UCL claim in the first consolidated complaint: failure to allege (1) economic injury, (2) an omission with the particularity required by Rule 9(b), and (3) a violation of the "unfair" or "unlawful"

United States District Court
Northern District of California

prongs. Because Plaintiffs have made minimal amendments to address the first requirement in the FAC, the issue is dispositive of Plaintiffs' UCL claim, and the Court need not reach Apple's other arguments.

To have statutory standing to bring their UCL claim, Plaintiffs must allege they lost money or property as a result of Apple's alleged unfair competition. Cal. Bus. & Prof. Code § 17204; *Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 323 (2011). In the FAC, Plaintiffs make the same allegations regarding damages as they did in the first consolidated complaint: (1) Apple "deprived Plaintiffs and Class Members of the economic value of their user data without providing proper consideration" (FAC ¶ 90); and (2) Plaintiffs "seek damages for the price premium paid to [Apple] for their Apple mobile devices" (*id.* ¶ 181), and "would not have purchased their devices from Defendant or would have paid less for them" (*id.* ¶ 178). The Court previously found these allegations insufficient to establish standing to bring UCL claims. MTD Order at 34–37. As to the user data theory, Plaintiffs only plead that their data is valuable in the abstract and fail to allege that they had any intention to sell the data Apple allegedly collected. *See id.* at 36. And as to the price premium theory, Plaintiffs still rely on conclusory allegations untethered to their own experiences. *See id.* at 37. The Court therefore GRANTS Apple's motion as to Plaintiffs' UCL claim for the same reasons the Court dismissed the claim in the first consolidated complaint.

### F. Implied Contract and Unjust Enrichment

The Court dismissed Plaintiffs' original implied contract and unjust enrichment claims because these claims relied on the express contracts underlying Plaintiffs' breach of contract claim. MTD Order at 23–24. As the Court explained, "there cannot be a valid, express contract and an implied contract, each embracing the same subject matter, existing at the same time." *Randall v. Univ. of the Pac.*, 2022 WL 1720085, at *4 (N.D. Cal. May 28, 2022). The Court acknowledged that Plaintiffs "may alternatively plead both a breach of contract claim and a quasi-contract claim, so long as [Plaintiffs] plead[] facts suggesting that the contract may be unenforceable or invalid," *Doe v. Regents of Univ. of Cal.*, 672 F. Supp. 3d 813, 821 (N.D. Cal. 2023), but found that Plaintiffs had not done so in their complaint. Apple argues that Plaintiffs

have not remedied these deficiencies in the FAC.

Plaintiffs counter that they have adequately pled a breach of implied contract in the alternative this time around. Yet, as Apple notes, the FAC is devoid of any allegation that Plaintiffs' express contract with Apple is unenforceable or invalid. Without facts even suggesting as much, Plaintiffs still have not adequately pled their implied contract and unjust enrichment claims. The Court thus GRANTS Apple's motion to dismiss these claims.

**G. Game Center Allegations**

Finally, Apple asks the Court to dismiss any allegations concerning Apple's Game Center. Apple argues that Game Center is not an app (RJN, Ex. 22, ECF No. 151-5), and none of the Plaintiffs allege that they themselves used Game Center (FAC ¶¶ 11–20), so any claims based on Game Center must be dismissed. Plaintiffs counter that Game Center was previously an app and that they included Game Center in the FAC "to highlight that Apple collects the same type of data across all of its Apps." Opp. at 27. Regardless of whether Game Center is an app, Plaintiffs do not dispute that they have not pled that Apple used Game Center to collect *their* data. This defect dooms any of their claims based on Game Center. *See Heeger v. Facebook, Inc.*, 509 F. Supp. 3d 1182, 1188 (N.D. Cal. 2020). Accordingly, Court GRANTS Apple's motion to dismiss all of Plaintiffs' claims based on Game Center.

**V. CONCLUSION**

For the foregoing reasons, the Court **GRANTS** Apple's motion. Plaintiffs' CIPA Section 638.51, CIPA Section 632, WESCA, constitutional invasion of privacy, UCL, implied contract, and unjust enrichment claims are dismissed. The Court also dismisses any claims based on Apple's Game Center without prejudice to Plaintiffs' amending their complaint to plead that Game Center collected their data.

It is doubtful whether Plaintiffs can sufficiently plead their dismissed claims given the deficiencies addressed in this Order, which have remained despite Plaintiffs' having had an opportunity to amend. However, the Court **GRANTS** leave to amend once more out of an abundance of caution. Any amended complaint must be filed within 30 days of this Order.

United States District Court
Northern District of California

United States District Court
Northern District of California

**IT IS SO ORDERED.**

Dated: January 20, 2026

EDWARD J. DAVILA
United States District Judge